TERRI F. LOVE, Judge.
|, Defendant Lawrence Williams was charged with four counts of armed robbery with a firearm. He was found guilty and sentenced to twenty-five years at hard labor on each of the four counts of armed robbery with a firearm without benefit of probation, parole, or suspension of sentence, with the sentences to run concurrently. Defendant timely appealed.
Defendant Williams maintains that the victims’ identifications of him were unreliable and should have, therefore been suppressed. He also contends that his conviction and sentence should be overturned because he was subject to suggestive identification. We find no abuse of the trial court’s discretion in denying the motion to suppress the identification. We further find that Defendant Williams was not subject to suggestive identification and affirm.
PROCEDURAL HISTORY AND FACTS
The State filed a bill of information, charging Lawrence Williams (“Defendant Williams”) with four counts of armed robbery with a firearm in violation of La. R.S. 14:64.3.[1] At his arraignment, Defendant Williams entered a |2plea of not guilty. The trial court found probable cause, and after a hearing, the court denied Defendant Williams’ motion to suppress the identification. A twelve-member jury found Defendant Williams guilty of four counts of armed robbery with a firearm. He was sentenced to serve twenty-five years at hard labor on each of the four counts of armed robbery with a firearm without benefit of probation, parole, or suspension of sentence, with the sentences to run concurrently. Defendant Williams timely appealed.
Ms. Kimberly Tompkins testified that she was out with two friends, Brittany and Heather, to celebrate Heather’s birthday at a club on Willow Street known as the “Frat House.” Brittany drove the three women to the vicinity of the club and parked her car near Willow Street. Ms. Tompkins testified that once all three women exited Brittany’s car, they were held up by a man with a handgun, who demanded that they give him their money. Ms. Tompkins gave the man ten dollars ($10.00), and Brittany and Heather each gave him twenty dollars ($20.00). The man did not take any of the women’s purses, only their cash. Although Ms. Tompkins’ encounter with the man was “no longer than five minutes,” she got a good look at him because the area in which she was robbed was well-lit due to lighting from a nearby building. After he took their money, the man “disappeared behind a building,” and the women got into Brittany’s car and drove away to call 911. Ms. Tompkins testified that she had not been drinking prior to the robbery, nor had either Brittany or Heather.
Ms. Tompkins testified that she received a call from Detective Baldwin about the May 2008 incident. Det. Baldwin drove to Ms. Tompkins’ residence, where he met *1210 with Ms. Tompkins, Brittany, and Heather, and asked each woman ^individually (and separately) to identify the man who held them up from a photographic line-up of six to eight suspects.
When Ms. Tompkins entered the room, Det. Baldwin told her that there was a suspect and that the suspect was in the line-up. After Ms. Tompkins identified Defendant Williams as the robber, Det. Baldwin said “okay.” Ms. Tompkins testified that when she picked Williams out in the line-up, she made the “best pick that [she] thought he looked like.” Ms. Tompkins identified Defendant Williams as the perpetrator and signed and dated the back of the photograph. The date indicated next to her signature on the photograph was July 23, 2008.
At trial, Ms. Tompkins was shown a handgun. Ms. Tompkins testified that the handgun shown to her at trial was not the handgun used by Defendant Williams on the night of the incident. The handgun used by Defendant Williams was silver and larger than the all-black handgun shown to her at trial.
Ms. Tompkins testified that the robbery occurred at around 10:30 p.m. or 11:00 p.m. on the evening of the incident. Ms. Tompkins testified that after the women got out of Brittany’s car in the 1400 block of Dublin St., they were taking photographs of each other when they were robbed. Although Ms. Tompkins had a camera and a cell phone on her at the time of the robbery, neither was taken from her.
Ms. Heather Keller testified that on the night of the incident, she, Ms. Tompkins, and their friend Brittany rode together to the Frat House to celebrate her birthday. They parked their car by a dumpster on Dublin Street, a side street. The dumpster was situated near a warehouse where parked streetcars are stored. The women got out of the car and started taking pictures of each other when a man came out from behind the warehouse, pulled a gun on the women, and ordered the |4women to give him their money. The three women put their hands up. They each had money, a phone, and a camera on their person. Ms. Keller testified that Brittany initially told the man that the women did not have any money, but the man tapped the gun and said again “give me your money.” Ms. Keller and Brittany each gave the man twenty dollars ($20.00), and Ms. Tompkins gave him ten dollars ($10.00). The man demanded more money, but the women promised him that they had given him all they had. The man then walked away. All three women then got into Brittany’s car and drove to the front of the Frat House to call 911. When they arrived at the bar, all three were visibly upset, and therefore, one of the women working in the bar called the police.
Ms. Keller testified that, at the time of the robbery, the man pointed the gun at all three women, and that she was “[r]eally scared” and “really just kind of shocked.” Ms. Keller testified that the robbery took place directly under a street light, and that the entire surrounding area was well-lit; she was therefore able to get a good look at the robber. Ms. Keller testified that for about ninety-nine percent of the time the robbery was taking place, she was looking directly at the robber’s face. Ms. Keller testified that the gun used by the robber was silver with a black handle. A gun was presented to Ms. Keller at trial, and she testified that the gun presented to her at trial was not the gun used by the robber. The gun presented at trial was much smaller than the gun used by the robber. Also, the gun used by the robber was a shiny silver color, as opposed to the gun presented to Ms. Keller at trial.
On cross-examination, Ms. Keller testified that, at the time of the robbery, she *1211 had money, a cell phone, and a camera on her, but that Defendant Williams took only her money. Ms. Keller testified that she had never seen the robber prior |fito the incident. Ms. Keller testified that Det. Baldwin told her that a suspect was pictured in the six-picture photographic lineup he presented to her, and that after she identified Defendant Williams as the robber and signed and dated the photograph.
Ms. Brittany Nagim testified that on the night of the incident, she, Ms. Keller, and Ms. Tompkins went out to celebrate Ms. Keller’s birthday at the Frat House. Ms. Nagim drove the women to the vicinity of the bar and parked her car. The women exited the car and started taking pictures in the middle of the street when a man came from nowhere, held a gun to them, and demanded that they hand over their money to him. Ms. Nagim initially said that she did not have any money, but realized that she had money in her hand as she said it. The man took about fifty dollars ($50.00) total from the women. The man demanded more money, but the women gave him all they had. After he took their money, the man disappeared, and the women got back into Ms. Nagim’s car and drove to the Frat House to call the police. Ms. Nagim remembered the gun the man held, and testified that it was bright silver, with a black handle.
On cross-examination, Ms. Nagim testified that after she gave Defendant Williams her money, she tried to get near her car so that he would not take her car. In doing so, she took “itty bitty steps and walked completely around him,” and was therefore able to get the “full dimension of his face.” The gun Defendant Williams held was shiny silver with a black handle, which was “very different” from the gun shown to her at trial.
Ms. Nagim testified that when she met with the detective for the photographic line-up, she was told by the detective that there was a suspect, and she should therefore look at the line-up and tell him whether one of the six guys in 16the line-up was the guy who robbed her and her friends. She looked at the line-up, pointed to Defendant Williams, and said “definitely; this is him.”
Mr. Timothy Moore testified that on the evening of the incident, at around 11:30 p.m., he went out to a bar, the Frat House, located near the streetcar den. Mr. Moore parked his car on the street next to the bar, and as he was getting out of the car, saw a man crossing the street behind him. As he went to close his car door, the man came over to him, pulled a gun on him, and said “give me what you got.” Mr. Moore testified that the handgun used was a silver handgun. Mr. Moore handed the man his wallet, which contained about three-hundred and fifty dollars ($350.00), and told the man that was all he had. Throughout the entire encounter, Mr. Moore stared right at the robber’s face, so much so that at one point, the robber said to him “Stop f--g looking at me.” After the man took his money, he ordered Mr. Moore to get back in his car and “get outta [there].” Mr. Moore got back into his ear and called the police.
Det. Baldwin contacted Mr. Moore and told him that he had a photographic lineup with a possible suspect pictured in the line-up. Mr. Moore met Det. Baldwin at police headquarters and was presented with the line-up. Mr. Moore identified Defendant Williams as the robber “right away.” Mr. Moore testified that he got a “very good” view of Williams on the night of the robbery, and that he was “[one] hundred percent” sure of his identification linking Defendant Williams to the robbery. Mr. Moore testified that the gun presented to him at trial was not the gun used by Defendant Williams during the robbery. The gun used in the robbery was larger *1212 than the gun presented to him at trial, and was also silver.
On cross-examination, Mr. Moore testified that he did not see the direction where Defendant Williams fled after the robbery because he was crouched down in 17his car. Mr. Moore’s initial description of the robber was that he was “about 35 or 40” and “was wearing [a] red shirt, blue jeans and ... a hat.”
Detective Jerry Baldwin, a New Orleans Police Department detective in the First District, testified that he became involved in the investigation of the robberies when he received the officer’s incident reports from his supervisor. When he first became involved in the investigation, he had a description of the perpetrator as being “5'9 to 5'10, 160 pounds, black male, dark complexion, with salt-and-pepper hair, especially on the sides.” Det. Baldwin testified that a suspect developed through an unrelated investigation, involving unrelated officers, where the subject being arrested matched the physical description provided of the perpetrator: “black male, late 30’s, early 40’s, salt-and-pepper hair.” During his arrest, a silver and black handgun was found on the suspect’s person.
Once Det. Baldwin got a description of the subject and all of the information, he put in a six-pack line-up. Det. Baldwin decided to put Defendant Williams in a line-up at this point because he fit the description of the perpetrator described in the four previous armed robberies, and he was found carrying a silver and black handgun.
Det. Baldwin first showed the line-up to Ms. Tompkins, Ms. Keller, and Ms. Nagim at Ms. Tompkins’ home. He showed each victim the line-up separately. All three victims were able to make a consistent identification. Because Defendant Williams had a band-aid on the right side of his eye when his line-up photograph was taken, Det. Baldwin placed a black dot on each of the candidates in the photo, so that Defendant Williams’ picture would not “stick out like a sore thumb.” Regarding the line-up, Defendant Williams’ picture was not in the same spot on each line-up so that the victims presented with the lineup could not agree to select |s“the first guy” or the like as the perpetrator. Det. Baldwin also testified that the gun found on Defendant Williams at the time of his arrest was placed in the evidence room, but was never able to be retrieved from the evidence room.
On cross-examination, Det. Baldwin testified that he spoke to each victim over the phone before he presented them with a line-up in an effort to set up a time for the identification, and to go over their description of the perpetrator with them. Det. Baldwin testified that he was the only police officer at Ms. Tompkins’ home presenting Ms. Tompkins, Ms. Keller, and Ms. Nagim with the line-up. Det. Baldwin testified that each woman made her line-up identification separately, and that after each woman made her identification of the suspect, he indicated to her that she had picked the correct suspect. Det. Baldwin testified that after Mr. Moore made his identification of the suspect, he indicated to Mr. Moore that he had picked the correct suspect.[2]
ERRORS PATENT
The record reveals no patent errors.
MOTION TO SUPPRESS THE IDENTIFICATION
Defendant Williams contends that the victims’ identifications of him were un *1213 reliable and should have therefore been suppressed. The jury found him guilty of four counts of armed robbery with a firearm. Defendant Williams argues that the identification procedures were unduly suggestive and resulted in the substantial likelihood of misidentification. Specifically, Defendant Williams argues that: (1) the photographic line-up focused on one single distinguishing feature of the robber |fl(salt- and-pepper hair), and not on other features as described by the victims, such as age, height, or weight; (2) Det. Baldwin told Ms. Tompkins and Ms. Keller to select the photograph of the person who most closely resembled the man who robbed them, even if they had to reach their conclusion by process of elimination; and (3) Det. Baldwin told the victims that the photographic line-ups contained a photograph of a possible suspect.
The law pertaining to the suppression of out-of-court identifications is well-settled:
La.Code of Criminal Procedure art. 703(D) provides that the defendant has the burden of proof on a motion to suppress an out of court statement. To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). Moreover, a defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990).
The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99); 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of mis-identification at trial. State v. Martin, 595 So.2d 592, 595 (La.1992). The U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty [ ^demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, Id. The corrupting effect of the suggestive identification itself must be weighed against these factors. Martin, 595 So.2d at 595.
In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Lewis, 2004-0227 (La.App. 4 Cir. 9/29/04); 885 So.2d 641, 652. A trial court’s determination on the admissibility of identification evidence is enti- *1214 tied to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray, 2000-0959 (La.App. 4 Cir. 9/26/01); 797 So.2d 764.
State v. Holmes, 2005-1248, pp. 6-7 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161.
Defendant Williams bases his misidenti-fication argument on the fact that the photographic line-up focused on one single distinguishing feature of the robber (salt- and-pepper hair). The record does not contain copies of any photographic line-up used in this matter. Additionally, none of the witnesses were questioned by the defense about whether their assailant had salt-and-pepper hair. Regardless, all of the witnesses testified that they were able to identify the Defendant Williams immediately and concretely when presented with the photographic line-up.
Defendant Williams also argues that Det. Baldwin, by indicating to Ms. Tompkins and Ms. Keller to select the photograph of the person most closely resembling the man who robbed them, was unduly suggesting that their assailant was pictured in the line-up. Ms. Tompkins identified Defendant Williams from the line-up and signed and dated her selection. Ms. Tompkins testified that she made the “best pick that [she] thought he looked like.” Ms. Keller testified that she was able to eliminate the other pictures “very easily” and identify Defendant Williams as her assailant “within no time.”
|„Lastly, Defendant Williams argues that because Det. Baldwin told the victims that the photographic line-ups contained a photograph of a possible suspect, it was unduly suggestive. Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. Under the totality of the circumstances, four separate witnesses independently identified Defendant Williams as their assailant, both quickly and conclusively. All four witnesses indicated that they were able to get a good look at Defendant Williams at the time of the robberies. Also, all four witnesses also identified and described a silver gun with a black handle that Defendant Williams was carrying at the time of the robberies, but that was not presented to them for identification at the time of trial.
Even assuming that the photographic line-up was unduly suggestive, looking at the Manson factors, there is no likelihood of misidentification. First, all four victims testified that they had ample time to view their assailant. Indeed, Ms. Tompkins, Ms. Keller, and Ms. Nagim each testified that the area in which they were robbed was well-lit and therefore, each was able to get a good look at their assailant. Mr. Moore testified that he stared at his assailant for so long, that his assailant finally ordered him to “Stop f--g looking at me.”
Secondly, as to the degree of attention, all of the victims were close enough to their assailant to be robbed at gunpoint. None of the victims had been drinking prior to being robbed. Ms. Keller testified that for the majority of the time the robbery was taking place, she was looking directly at her assailant’s face. Ms. Nag-im testified that, in an effort to protect her car, she was able to walk completely around her assailant and get the “full dimension of his face.” Mr. Moore testified that he got a “very good” view of his assailant on the night of his robbery.
[ 12Third, as to the accuracy of the description, all of the witnesses’ descriptions were consistent and unwavering. Indeed, Ms. Tompkins, Ms. Keller, and Ms. Nagim each described an identical incident. We also note that at trial, the defense did not *1215 ask Ms. Tompkins, Ms. Keller, or Ms. Nagim to describe what their assailant looked like at the time of the actual robbery. Mr. Moore testified that his assailant was “about 35 or 40” and “was wearing [a] red shirt, blue jeans, and ... a hat.” Additionally, none of the witnesses identified the gun presented to them at trial as the gun used by their assailant.
Fourth, as to the certainty of the description, all four witnesses identified Defendant Williams immediately from the photographic line-up presented to them. Ms. Keller testified that she was able to eliminate the other photographs in the photographic line-up “very easily,” and identify Williams as her assailant “within no time.” Ms. Nagim testified that when she was presented with the line-up she identified Defendant Williams’ picture and stated “definitely; this is him.” Mr. Moore testified that he identified Williams in the line-up “right away.”
The last Mamón factor is the length of time between the crime and the confrontation. Ms. Tompkins, Ms. Keller, and Ms. Nagim testified that on July 23, 2008, they were presented with a photographic lineup of potential suspects. They were robbed on May 16, 2008. Similarly, Mr. Moore testified that on July 2008, he was presented with a photographic line-up of potential suspects. He was robbed on May 18, 2008.
In State v. Sterling, 96-1390, p. 5 (La.App. 4 Cir. 11/13/96), 684 So.2d 74, 78, this Court held that a three-month lapse between the crime and the photographic lineup is not so long as to make the identification unreliable. See also, State v. Jones, 2010-1026, p. 2 (La.10/1/10), 48 So.3d 210, 211 (“Nor do we lisfind the two month delay between the lineups an unreasonable length of time that would increase the likelihood ofmisidentifieation.”).
Considering the foregoing, we find that weighing the identification against the Maman factors indicates that the identification process was reliable. We find no abuse of the trial court’s discretion in denying the motion to suppress the identification.
Defendant Williams contends pro se that the trial court’s conviction and sentence should be overturned because he was subject to suggestive identification. Defendant Williams argues that each victim stated that they only saw a black male with salt and pepper hair and a silver hand gun. Defendant Williams further argues that each victim testified that they did not see their assailant’s face.
Defendant Williams’ arguments lack merit. None of the victims was questioned as to whether his or her assailant had salt- and-pepper hair. Further, none of the victims testified that they did not see their assailant’s face. Indeed, all of the victims testified that they were able to get a good look at their assailant’s face. We find that Defendant Williams was not subject to suggestive identification. We therefore affirm Defendant Williams’ convictions and sentences.
DECREE
We find that the trial court did not abuse its discretion in denying the motion to suppress the identification. Defendant Williams was not subject to suggestive identification. Accordingly, Defendant Williams’ convictions and sentences are affirmed.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED

. Additionally, on July 21, 2008, the State charged Lawrence Williams with one count of felony possession of a firearm in violation of La. R.S. 14:95.1. This count was later severed from the other (four) counts of armed robbery, which are the subject of the present appeal. After a twelve-member jury could not reach a verdict, the trial court declared a mistrial on this count.

. The State also called Officer Stephanie Bris-coe as a witness. Off. Briscoe, whose role is to supervise the 911 operators and dispatchers, testified as to the 911 call received in relation to the subject incident.