MAX N. TOBIAS, JR., Judge.
_JjMichael Shannon (“Shannon”), the defendant, was initially charged by a bill of information filed on 14 July 2005 with manslaughter. On 28 July 2005, he was indicted for the second degree murder of Ralph Cole under case number 461-701. On 21 September 2006, the trial court denied Shannon’s motion to suppress the identification. On 7 June 2008, the state entered a nolle prosequi after its motion to continue the trial was denied. The state then filed a bill of information on 11 June 2008 again charging Shannon with manslaughter. On 12 June 2008, Shannon was re-indicted for second degree murder under the case number 478-693. On 13 November 2008, the trial court granted the defendant’s motion to quash. On appeal, we reversed the trial court’s ruling. State v. Shannon, 09-0305 (La.App. 4 Cir. 9/9/09), 17 So.3d 1061.
On 2 February 2011, the case proceeded to trial and Shannon was found guilty as charged by the jury. On 4 April 2011, he was sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence. This timely appeal followed.
I.
12At trial, Dr. James Taylor, a forensic pathologist, testified that he is the director of autopsy and forensic services at LSU Health Sciences Center in Shreveport, Louisiana. After reviewing his professional career, he was admitted as an expert in the fields of medicine and forensic pathology. In November 2004, Dr. Taylor was working at the coroner’s office in New Orleans in association with the LSU Health Sciences Center of New Orleans. On 22 November 2004, he conducted an autopsy on Ralph Cole and identified the cause of Mr. Cole’s death as two gunshots to the head.
Darrin Cole (“Cole”), the deceased’s brother, testified that on 30 October 2004, he attended the Southern University homecoming reunion in Baton Rouge, Louisiana. He and some friends traveled to Baton Rouge together on their motorcycles. While Cole was at the homecoming, *70 an incident occurred. Cole related that he was smoking his tires or “burning rubber,” and unbeknownst to him someone was behind him at the time. The man, whom Cole subsequently learned was named Wayne Palmer (“Palmer”), came up to him and said “Hey man, you shot all this rubber on me.” Cole apologized to Palmer, but, within moments, Palmer struck him in the face while Cole was still sitting on his motorcycle. The motorcycle fell over. Cole grabbed Palmer, and a scuffle ensued. Security officers with Southern University arrived and broke up the fight. Both Cole and Palmer were detained and given summonses to appear in court. Cole identified a photograph of Palmer and the summons he received.
Cole related that he had been riding motorcycles since 1974 and owns a Suzuki 1300. His brother, the victim, also owned a Suzuki 1800 at the time of his death. The two motorcycles were identical except for their color. About a week |sbefore his brother’s death, Cole gave him an extra pair of green panels for his gray-colored motorcycle that he had.
Cole testified that Shannon and Palmer were cousins. He stated that he knew this because he had friends that grew up in the same neighborhood and who had attended school with Palmer. Cole acknowledged having felony convictions for second offense possession of marijuana, possession of cocaine, attempted simple burglary, and possession of a firearm. His most recent conviction occurred in 1990.
Kenneth Guy, an officer with the Southern University Police Department, testified that on 30 October 2004, he responded to a disturbance near the activity center involving two individuals. The men were taken to department headquarters where they were identified as Palmer and Cole. Both men were issued summonses for disturbing the peace.
Jeff Jacobs testified that he was currently employed by the United States Department of State. In 2004, he was employed as a homicide detective by the New Orleans Police Department in the third police district. At approximately 4:45 p.m. on 21 November 2004, he was notified of a shooting that occurred in the 3500[1] block of Chef Menteur Highway in New Orleans.
Detective Jacobs proceeded to the scene, an Exxon gasoline station, located at the intersection of Chef Menteur Highway and Louisa Drive. Medical assistance had already been rendered to the deceased victim whose body was still at the scene. Detective Jacobs interviewed several witnesses and collected some incidental evidence, including a pair of sunglasses and an empty Heineken beer |4bottle. He interviewed the cashier at the Exxon station who was working at the time of the offense as well as Mitchell Mikins and Jared Lewis, who were in a vehicle which was stopped at the traffic light at the intersection. He also spoke with Anthony Angeline and Wayne Faulk, who were friends of the victim and had been riding motorcycles with him on the day of the incident. Detective Jacobs identified some thirteen photographs taken at the scene. Jacobs obtained surveillance video from the Exxon station and from a nearby Winn Dixie grocery store, but neither proved useful.
During the course of his investigation, Detective Jacobs spoke with Sergeant Kenneth Guy with the Southern University Police Department in Baton Rouge. After speaking with Mr. Guy, he assembled two photographic lineups, each of which includ *71 ed a photograph of Palmer. Detective Jacobs identified the lineups in court and they were admitted into evidence. No witness was able to make an identification from the lineups.
Detective Jacobs then spoke with a confidential informant about the case. He also spoke with Detective Catherine Beckett and Officer Thelonious[2] Dukes. Detective Jacobs then created two identical photographic lineups which included photographs of Shannon. He showed one lineup to Anthony Angeline, who was unable to make an identification. On 3 May 2005, he showed the other lineup to Emma Bour-goyne, an eyewitness to the murder, at her residence. He presented the lineup to her while she was seated at her kitchen table. She studied the photographs and eventually made a positive identification. Jacobs’s testimony regarding Ms. Bourgoyne’s identification was as follows:
lfiA. Almost immediately, Ms. Bour-goyne ruled out certain individuals in the lineup, and she was concentrating on two photographs. So what I did was, I placed pieces of paper over the four that she said they’re definitely not the individual who shot the victim. After concentrating on the last two photographs, she stated that the perpetrator on the date of the incident was wearing a baseball cap, almost to the point where she said, “I wish he was wearing a cap in these photos.” So I took a small piece of paper and placed it on the top of the remaining two photographs, and almost immediately she identified Michael Shannon.
Detective Jacobs then had Ms. Bour-goyne sign, initial, and date the rear of the lineup to signify her identification. He then obtained a warrant for Shannon’s arrest.
Ms. Bourgoyne testified that on the day of the incident she was in an automobile traveling on Louisa Drive. The car was the second vehicle at the red light. She testified as follows regarding what she saw that afternoon:
Q. Would you describe the conditions that day?
A. It was a little after 4:30 and it was bright and sunny, a beautiful day in November.
Q. On November 21, 2004, did anything draw your attention?
A. We, while we were stopped at the traffic light, I looked over at the Exxon Station which was to my right and opposite the middle pumps, there was [sic] three beautiful motorcycles there, but I particularly noticed the bright green one. I like green.
Q. After you saw the bright green motorcycle, were there any people around the motorcycle?
A. There were three gentlemen.
|6Q. Okay. Did anything else draw your attention that day?
A. There was a gentleman that walked — was walking casually up, and I — I particularly look at him because he looked like my husband’s ex-boss, and I said, gee, I wonder what he’s doing. And he was just walking up like he was going to go talk to the man.
Q. Okay. Now, when you said you thought he was your husband’s ex-boss, at any time did you believe that it wasn’t your husband’s ex-boss?
*72 A. After I looked at the man closely, I realized it wasn’t.
Q. Okay, So when you were looking at this man, what did you see him do?
A. He walked up to the group of men, and just like he was going to talk to him, and raised his hand like he was going to maybe high five, tell them hello, and at that same time, I — I heard pop, pop, pop, and it was — it was a gun.
Q. Okay.
A. I knew it was a gun. I know what a gun sounds like. And the man in the middle fell over.
Ms. Bourgoyne stated that she was approximately twenty to twenty-five feet from the shooter at the time of the incident. As the shooter approached the victim from behind, he was facing Ms. Bour-goyne, which is why she could see his face so clearly. She estimated that she was looking at the shooter for approximately fifteen to twenty seconds as he approached the three men. She stated that the man just walked up casually to the group of three men.
17After firing the shots, the man ran off in the direction of the Winn Dixie. Ms. Bourgoyne and her husband attempted to follow the shooter, but they were unsuccessful. They returned to the scene where she spoke to the police. Afterwards, a detective took her home.
The following evening, Detective Jacobs took her some photographs to view. She did not see the shooter in the photographic lineup.
A couple of months later, Detective Jacobs called again at her house. She readily identified the shooter from the photographic lineup presented to her. Ms. Bourgoyne stated that she recognized the shooter immediately from the group of photographs, but she wanted to study the photographs to be completely sure. She explained that she was one hundred percent sure the first time she looked at the photographs and that after Detective Jacobs covered the heads with the paper she was more than one hundred percent sure. She had no doubt in her mind that she identified the right person. Ms. Bour-goyne stated that she came to court for some type of hearing and identified the shooter in court. She was more than one hundred percent sure of her in-court identification. Ms. Bourgoyne identified Shannon in the courtroom at trial.
Ms. Bourgoyne stated that she did not remember informing an assistant district attorney that she was not wearing her glasses on the day of the incident; she stated that she usually wears her glasses and that she only needs them for reading. Ms. Bourgoyne removed her glasses in the courtroom and was able to identify the number of fingers the assistant district attorney was holding up. She could not read from a document the assistant district attorney handed her until she replaced her glasses.
IsThe parties stipulated that Ms. Bour-goyne informed a member of the District Attorney’s Office that she was not wearing her glasses on the date of the incident.
II.
A review of the record for errors patent reveals none.
III.

COUNSELED AND PRO SE ASSIGNMENT OF ERROR NUMBER 1.

Shannon, both through counsel and pro se, argues that his conviction and sentence should be reversed because the trial court erred in denying his pre-trial motion to suppress Ms. Bourgoyne’s May 2004 iden *73 tification of the accused in a photographic lineup.
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentifieation existed as a result of the identification procedure. State v. Sparks, 88-0017, p. 52 (La.5/11/11), 68 So.3d 435, 477; State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the accused. State v. Thibodeaux, 98-1673, p. 20 (La.9/8/99), 750 So.2d 916, 932.
Even if the identification could be considered suggestive, it is the likelihood of misidentifieation that violates due process, not merely the suggestive identification procedure. State v. Payne, 04-828, pp. 4-5 (La.App. 5 Cir. 12/14/04), 892 So.2d 51, 53. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found 1^reliable under the totality of circumstances. State v. Guy, 95-0899, pp. 9-10 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, 523.
In Manson, supra, the Court set forth a five-factor test to determine whether a suggestive identification is reliable, to-wit: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Id., 432 U.S. at 114-16, 97 S.Ct. 2243, citing Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In determining the likelihood of misidentifieation of a suspect, a court must look to the “totality of the circumstances” as informed by the five factors. Neil, 409 U.S. at 199, 93 S.Ct. 375. In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial and at a hearing on the motion to suppress the identification. State v. Lewis, 04-0227, p. 18 (La.App. 4 Cir. 9/29/04), 885 So.2d 641, 652. A trial court’s determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray, 00-0959, p. 5 (La.App. 4 Cir. 9/26/01), 797 So.2d 764, 769, citing State v. Bickham, 404 So.2d 929 (La.1981).
The gravamen of Shannon’s argument is that the personal involvement of Detective Jacobs in the lineup procedure influenced Ms. Bourgoyne’s identification by covering four photographs and by using a small piece of paper to simulate a hat on the remaining two individuals.
Although the detective’s actions during the lineup procedure were not commonplace, we find nothing in the record which suggests that Ms. Bourgoyne’s identification was the unreliable product of a suggestive identification technique.
|inAt trial, Ms. Bourgoyne testified as follows concerning the May 2005 identification procedure that occurred at her home.
Q: Now, when he showed you those photographs, were you able to identify anyone?
A: Yes.
Q: Okay. How long did it take you to identify someone?
A: Well, when he showed me the pictures, right away I saw the man that did the shooting, but I wanted to study them more-—
*74 Q: Okay.
A: —to be sure.
Q: And which man did you think— which photograph did you think was the shooter?
A: Number two.
Q: Okay. What happened next, Ms. Emma?
A: I told Mr.—the detective told me, did I identify anybody? I said yes, but I want to really study them, and so he walked away and gave me a good bit of time to look and study them, and then I told him that I was sure, I was positive. Q: Did he put anything over any of the photographs?
A: No. What the detective did was, I eliminated certain ones off the thing to make me more than a hundred percent sure. So he covered them with papers, the—all the ones I eliminated.
Q: Okay. And then what happened?
A: I concentrated and then I was more than a hundred percent sure. And then I did tell him that the gentleman that did the shooting had a baseball cap. So then he covered like the forehead to kind of give me an image of like somebody wearing a cap.
Q: Were you a hundred percent sure of your identification when you looked at that photograph?
II tA: The first time I was a hundred percent sure, but once we covered the photos and put the paper over the head, I was more than a hundred percent sure.
At the hearing on the motion to suppress the identification, Ms. Bourgoyne testified that Detective Jacobs covered all the photographs and then had her view each photograph, one at a time.
As the state notes, had Ms. Bour-goyne participated in a physical lineup, the procedures employed by the detective would have been no different than having one or more individuals step forward either at the victim’s request or as part of a procedure. See United States v. Wade, 388 U.S. 218, 222-23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), noting that during a lineup a suspect may be ordered “to write or speak for identification, ... to assume as stance, to walk, or to make a particular gesture,” quoting Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In the case at bar, the most important aspect of the procedure was that it was Ms. Bourgoyne, not Detective Jacobs, who eliminated the four photographs as possibilities. By covering the photographs, Detective Jacobs simply allowed Ms. Bourgoyne to focus her attention on the remaining two photographs.
Likewise, we do not find it improper or suggestive for Detective Jacobs to place a piece of paper on the photographs to simulate a hat. See Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021(1910) (noting that a suspect may be compelled to wear a particular article of clothing). Ms. Bourgoyne stated that the perpetrator wore an orange baseball cap. Accordingly, the hairstyles of the subjects were not relevant factors for purposes of the identification. Because Detective Jacobs placed pieces of paper on both subjects’ heads, he did not suggest which subject to identify.
| ^Shannon, pro se, also suggests that the photographic lineup was suggestive—not in a manner but in appearance. He suggests that he was the oldest person in the lineup which rendered it unduly suggestive. We have reviewed the photographic lineup, which is part of the record on appeal. All the photographs depict African-American males of similar build with light moustaches and short hair. All appear to share similar skin color. However, *75 one photograph, not of Shannon, appears to have been created using a stronger photographic flash than the rest. With respect to the age of the men depicted, we acknowledge that one could suggest that two of the men appear somewhat younger than Shannon, but a fair viewing does not support the conclusion the lineup unduly focused attention on the defendant. Furthermore, the photographs depict men of sufficient physical similarity to test Ms. Bourgoyne’s identification.
In sum, we find nothing to suggest that the photographic lineup was suggestive. Accordingly, the trial court properly denied the motion to suppress the identification. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 2.

In Shannon’s second assignment of error, he argues that the evidence was insufficient to convict him of second degree murder. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311, citing State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
A positive identification by only one witness may be sufficient to support a defendant’s conviction. Id.; State v. Mussall, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the credibility of the witnesses, and a reviewing court will generally not second-guess those determinations. State v. Bright, 98-0398, p. 22 (La.4/11/00), 776 So.2d 1134, 1147.[3]
In support of his argument, Shannon argues that Ms. Bourgoyne’s identification was not a positive identification because it was arrived at by a process of elimination. He takes note of Ms. Bour-goyne’s statement that she was “more positive” of Shannon’s photograph after she had narrowed it down to two photographs. He also reiterates the claim that Detective Jacobs improperly influenced her identification.
Review of the five Manson factors set forth in the defendant’s first assignment of error reflects that Ms. Bourgoyne’s identification was reliable. As reviewed in the statement of facts, Ms. Bourgoyne’s opportunity to view Shannon was excellent — it was a bright sunny day; she estimated that she was only some twenty to twenty-five feet from the murder as it occurred. The perpetrator was facing her as he approached the three men. From her testimony, it is clear that she was distinctly focused on both the perpetrator and his actions at the time of murder, |14and it is clear that her attention to detail was high. It is notable that Ms. Bourgoyne’s observations occurred from a place of safety and that she had no reason to be fearful as she observed the perpetrator’s actions. Fur *76 thermore, she found the scene intriguing and exhibited a level of attention above that of a casual observer. We also note that of the four men at the gas station, Ms. Bourgoyne’s attention was focused on the perpetrator. Finally, the key aspect of Ms. Bourgoyne’s identification was that she was focused on Shannon’s facial features while observing him as she was attempting to confirm whether she recognized him or not.
Turning to the third factor of Manson, no indication in the record exists as to whether Ms. Bourgoyne provided a description of the perpetrator, so this factor weighs neither in favor nor against reliability. State v. Sparks, 88-0017, pp. 53-57 (La.5/11/11), 68 So.3d 435, 477-78.
With respect to the fourth Manson factor, Ms. Bourgoyne’s level of certainty in her identification was extremely high.
As to the fifth Manson factor, the time between the crime and the identification was approximately four and a half months. In Neil, supra, the Court noted that a delay of seven months would be considered a “seriously negative factor” in most cases, 409 U.S. at 201, 93 S.Ct. 375. However, the Court found no substantial likelihood of misidentification after weighting all of the other factors where the victim had an unusual opportunity to observe and identify her assailant and testified that there was something about the perpetrator’s face that she could never forget. In Hudson v. Blackburn, 601 F.2d 785 (5th Cir.1979), the court found a |lfidelay of six months was tolerable where the strength of the other indicia of reliability had persuaded the court the no mistake had been made.
Also in State v. Williams, 10-1197 (La.App. 4 Cir. 5/25/11), 66 So.3d 1207, we upheld the identifications made by three victims two months and one week after they were robbed at gunpoint by the defendant. In State v. Jones, 10-1026 (La.10/1/10), 48 So.3d 210, the Court held that a two-month delay between the lineups was not an unreasonable length of time that would increase the likelihood of misidentification. In State v. Sterling, 96-1390 (La.App. 4 Cir. 11/13/96), 684 So.2d 74, this court found that three months between the crime and the photographic line-up was not so long as to make the identification unreliable.
Here, given the strength of the remaining three Manson factors, we find nothing to suggest that the delay in making an identification led to a tangible probability of misidentification. The evidence establishing Shannon’s identity as the perpetrator was clearly sufficient to support his conviction. This assignment of error lacks merit.
IV.

CONCLUSION

The conviction and sentence of Michael Shannon is affirmed.
AFFIRMED.

. Although Detective Jacobs testified it was the 3500 block, we take judicial notice that he meant the 4500 block. La. C.E. 201.

. The transcript of the trial identifies him as "Felonious” Dukes and that he is now deceased.

. In Bright, pp. 22-23, 776 So.2d at 1147, the Court stressed that:
[W]e are mindful that the touchstone of Jackson v. Virginia is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.” State v. Mussall, 523 So.2d at 1310.