Leon A. Cannizzaro, Jr., District Attorney, Orleans Parish, Scott G. Vincent, Assistant District Attorney, 619 South White Street, New Orleans, LA 70119, COUNSEL FOR APPELLEE, STATE OF LOUISIANA
Julie C. Tizzard, JULIE C. TIZZARD, L.L.C., 700 Camp Street, Suite 101, New Orleans, LA 70130, COUNSEL FOR DEFENDANT/APPELLANT, AJA DOUCETTE
Katherine M. Franks, Louisiana Appellate Project, P.O. Box 220, Madisonville, Louisiana 70447, COUNSEL FOR DEFENDANT/APPELLANT, BRANDON GUIDRY
(Court composed of Judge Terri F. Love, Judge Joy Cossich Lobrano, Judge Tiffany G. Chase )
Judge Terri F. Love *706 This appeal arose from a French Quarter shooting outside the Famous Door wherein one man was killed and another gravely injured. The two defendants include the principal and his female companion. The principal appealed contending that the trial court erroneously denied his motion to suppress the identification by the surviving victim, that the trial court erred by denying him the opportunity to introduce other photographs of a man he alleged to be the "real" murderer, and because he was allegedly unable to completely view the videos placed into evidence at trial.
We find that the trial court correctly denied the principal's motion to suppress the identification because the lineup was not unduly suggestive. The trial court did not abuse its discretion by denying the principal's attempt to introduce more pictures of an alleged shooter because one was already admitted into evidence. Lastly, the principal did not demonstrate that he was prejudiced as a result of his alleged inability to view the videos completely at trial. Accordingly, his convictions and sentences are affirmed.
The female companion appealed asserting that her sentence for being an accessory after the fact was excessive. We do not find that her sentence was excessive. Her guilty plea and sentence are affirmed.
FACTUAL BACKGROUND AND TESTIMONY
Two men were shot on March 21, 2015, near the intersection of Conti and Bourbon Streets. Bruce Tims was fatally wounded, while Anthony Joseph survived his injuries.
New Orleans Police Officer Girod Peterson, of the Eighth District, which encompasses the French Quarter and the Central Business District, responded to the shooting. As he approached the scene, Officer Peterson viewed a wounded man down in the middle of the 700 block of Conti. Officer Peterson noticed a second man down on the ground near the 800 block of Conti. Officer Peterson's role in the investigation was primarily to secure the scene. The body camera video taken by Officer Peterson was played and introduced into evidence.
New Orleans Police Homicide Detective Rayell Johnson, the lead homicide investigator on the homicide of Mr. Tims and attempted homicide of Mr. Joseph, explained there are several bars, hotels, and restaurants in the area where the crime occurred. The shooting took place on the corner of Bourbon and Conti outside the Famous Door. During his investigation, Det. Johnson obtained surveillance video footage from businesses with cameras in the area. Det. Johnson assigned homicide detectives to go to the hospital to speak with Mr. Joseph.
Det. Johnson identified photographs taken at the scene depicting the location and evidence including shell casings. Det. Johnson stated that Mr. Joseph was found on the sidewalk on Conti, next to the Famous Door, right off of Bourbon Street.[1]
*707 Mr. Tims ran on Conti in the opposite direction from Mr. Joseph and was found on Conti next to the Famous Door. Det. Johnson identified a photograph, which depicted a silver Honda next to the Famous Door. Det. Johnson stated the silver Honda was significant because a witness was seated inside the vehicle. The witness was identified as Felicia Williams.[2] Ms. Williams knew both victims and had been with them that evening. Both victims had traveled to the French Quarter with Ms. Williams in the silver Honda.
Det. Johnson identified the bullet casings found on the scene and also collected surveillance footage from various locations including the Swamp, the Last Call, the Jester, and Oceana. Det. Johnson obtained the surveillance footage from the Swamp because he learned a prior incident involving Brandon Guidry and a possible witness occurred at that location. Footage from the Last Call was obtained because a fight involving Mr. Joseph occurred at that location. Footage from the Jester was obtained because it showed views of Conti towards Rampart and Conti towards the river as well as views of Bourbon and Conti. The surveillance camera from Oceana points toward the Famous Door, where the homicide occurred.
The videos were played for the jury, beginning with the video from the Swamp. Det. Johnson noted that the video footage from the patio depicted Mr. Guidry walking with Aja Doucette, his then romantic interest. Det. Johnson learned Ms. Doucette was with Mr. Guidry prior to the incident. Ms. Doucette was with Mr. Guidry when Mr. Joseph and Mr. Guidry fought at the Last Call. The footage showed Mr. Guidry wearing suspenders and high socks, and Ms. Doucette wearing light colored pants and a black top. Mr. Guidry remained at the Swamp while Ms. Doucette worked. When Mr. Guidry left the Swamp he went to the Last Call, where he encountered Mr. Joseph, with whom he eventually fought.
Det. Johnson learned that Mr. Guidry and Mr. Joseph fought at the Last Call thirty to thirty-five minutes prior to the shooting. A photograph of Ms. Doucette, Mr. Guidry and Mr. Joseph, taken from the video footage at the Last Call, was shown to the jury. Det. Johnson stated the Last Call is a half a block from where the shooting occurred.
Mr. Joseph, the surviving victim, testified that he knew the deceased victim, Mr. Tims, for a few years. Mr. Joseph and Mr. Tims went to Bourbon and Conti to the Last Call along with Ms. Williams. Ms. Williams drove. The three were ordering food, when a young man tapped Mr. Joseph on the shoulder and asked to talk to him. Mr. Joseph had not seen the person before. The man asked Mr. Joseph whether he knew the woman standing with him. Mr. Joseph recognized the woman, but did not know her name. They spoke for a few minutes, but the situation was uncomfortable. Mr. Joseph denied repeatedly on the stand that he had grabbed Ms. Doucette's behind. Mr. Joseph said the argument turned physical when the man sprayed mace in his face. Mr. Joseph then walked to Déjà Vu on Conti to wash his face with milk to remove the mace. Mr. Joseph's face was numb, but he could see where he was going.
After Déjà Vu, Mr. Joseph, Mr. Tims, and Ms. Williams decided to return to the vehicle. Because Mr. Joseph could not smoke in the vehicle, the group waited for him to smoke outside the vehicle. The vehicle was parked near the Famous Door on Conti and Bourbon. As he smoked, Mr. *708 Joseph was saying to Mr. Tims that he could not believe what had happened. As Mr. Joseph was smoking, he saw the person who had sprayed mace on him earlier approach down Bourbon in the middle of the street and raise a gun from his waist. Mr. Joseph saw him shoot in the direction he and Mr. Tims were standing. Mr. Joseph identified Mr. Guidry as the person he fought with at the Last Call; who sprayed him with mace; and shot him as he smoked on Bourbon and Conti. Mr. Joseph said after the first shot was fired, he ran toward Mr. Guidry to try and grab the gun. Mr. Guidry continued to backup and shoot. Mr. Joseph was shot three times.
Mr. Joseph identified himself and Mr. Tims in a video near the parked Honda when the shooting took place. After being shot, Mr. Joseph was taken to the hospital, where he later met with detectives. After his release from the hospital, Mr. Joseph was shown a six-pack photographic identification line-up. Mr. Joseph identified the photograph of Mr. Guidry as the individual he had the dispute with and as the shooter.
Ms. Doucette, Mr. Guidry's romantic interest at the time of the shooting, testified that she already pled guilty to one count of accessory after the fact to second degree murder and accessory after the fact to attempted second degree murder. Ms. Doucette was awaiting sentencing. At the time of the shooting she was employed by the Swamp as a shot girl. Mr. Guidry accompanied Ms. Doucette to the Swamp that evening as she began her shift. Once she finished working, she and Mr. Guidry eventually walked to the Last Call where Mr. Guidry and Mr. Joseph were in an altercation. Ms. Doucette stated that she was unaware of the cause of the fight. Sometime after the altercation, Ms. Doucette was separated from Mr. Guidry. Ms. Doucette testified that she heard the gunshots, but did not see the shooting and never saw Mr. Guidry with a firearm. She then attempted to find out if anyone she knew was hurt. Ms. Doucette stated that she ingested at least twenty alcoholic shots while at work, one pill of ecstasy walking to work, as well as a marijuana cigar walking to work. She also consumed some alcohol after leaving work.
Ms. Doucette stated that Mr. Guidry contacted her the Sunday following the shooting and asked to meet with her. Mr. Guidry then asked Ms. Doucette to drive him to Miami, Florida. Although she worked and had two kids, Ms. Doucette testified that she drove Mr. Guidry to Florida and paid for all the gas to do so. She stated that she did not ask Mr. Guidry why he wanted to go to Florida. Ms. Doucette said that she and Mr. Guidry did not talk on the way to Florida, but instead just listened to music for twelve hours. After staying with Mr. Guidry about a day, she returned to New Orleans.
Upon her return, Ms. Doucette and her mother met with police officers investigating the shooting. She identified a photo of herself, but misidentified Mr. Guidry as "Ashton." Ms. Doucette stated that she misidentified Mr. Guidry because she was "nervous" and "didn't know what was going on." However, her mother immediately identified the picture as Mr. Guidry. Ms. Doucette then stated to her mother that she was going to get herself killed. Ms. Doucette explained that she was just trying to protect her mother from people who could be trying to go after Mr. Guidry because she was closest to him. Ms. Doucette traveled back to Florida in May and remained there with Mr. Guidry for three months.
Det. Johnson stated that when Ms. Doucette arrived with her mother she was "very confrontational," "real stand-offish," and did not "want to talk with me or cooperate in the investigation in any kind *709 of way." Det. Johnson testified that Ms. Doucette gave a false name for Mr. Guidry.
PROCEDURAL HISTORY
On December 10, 2015, Ms. Doucette, was charged by bill of information with accessory after the fact to second degree murder, a violation of La. R.S. 14:(25)30.1 and accessory after the fact to attempted second degree murder, a violation of violations La. R.S. 14:(25)(27)30.1. Ms. Doucette appeared for arraignment and entered a plea of not guilty to each count. Ms. Doucette withdrew her prior plea of not guilty and entered a plea of guilty to each count. Ms. Doucette was charged as a multiple offender on both counts based upon a prior conviction for possession of a Schedule II narcotic.
Ms. Doucette was initially sentenced on each count to five years imprisonment at hard labor in the custody of the Department of Corrections, with credit for time served, with the sentences to be served concurrently. At the multiple bill hearing conducted on the same day, Ms. Doucette was found guilty of being a second offender. At that time, the trial court vacated Ms. Doucette's prior sentences and resentenced her on both counts as a multiple offender to eight years at hard labor, with credit for time served, with the sentences to be served concurrently. Ms. Doucette's appeal followed.
On December 10, 2015, the Orleans Parish Grand Jury returned an indictment charging Mr. Guidry with second degree murder and attempted second degree murder, violations of La. R.S. 14:30.1 and (27)30.1, respectively. Mr. Guidry appeared for arraignment and entered a plea of not guilty. Mr. Guidry's counsel filed a number of written pre-trial motions, including a Motion to Suppress Identification. The trial court denied the Motion to Suppress Identification. Notably, Mr. Guidry did not object to the trial court's ruling denying his Motion to Suppress Identification, nor did he seek supervisory review of the ruling.
Mr. Guidry's case proceeded to a jury trial. At the conclusion of the trial, the jury returned a verdict of guilty as charged on both counts. Mr. Guidry filed a motion for a new trial, which was denied.
Mr. Guidry was sentenced to life imprisonment for second degree murder and to fifty years at hard labor for attempted second degree murder, both sentences to be served without benefit of probation, parole or early release, to be served concurrently. Mr. Guidry orally stated his intention to seek an appeal.
ERRORS PATENT
A review of the record reveals no errors patent in regards to either Ms. Doucette or Mr. Guidry.
MS. DOUCETTE
Ms. Doucette's sole assignment of error on appeal is that she received an excessive sentence. A review of the record reflects that Ms. Doucette entered a plea of guilty to both charges. Ms. Doucette was advised of the rights she was waiving by entering pleas of guilty and acknowledged such by completing a Felony Waiver of Constitutional Rights Plea of Guilty Form. In completing the form, Ms. Doucette acknowledged she was entering the pleas of guilty because she was in fact guilty of the crimes. Ms. Doucette was advised that the sentence she could receive would be between zero and five years with or without hard labor. The trial court found there was a substantial factual basis for the guilty pleas and ordered it recorded. Following the acceptance of the plea as to both *710 counts, the State filed a multiple bill. The multiple bill was undisputed.
At the sentencing hearing, the trial court heard witness impact statements from the victims' families. Ms. Doucette was found to be a second felony offender pursuant to La. R.S. 15:529.1 and was notified that sentencing would be between two-and-one-half to ten years. Following arguments by counsel, the trial court stated:
Ms. Doucette, the thing that I find most troubling about your participation in Mr. Tims' murder is your continued and unapologetic lack of remorse. You have been unremittingly false with everything you have done. Every act that you have taken, from the moment law enforcement got involved in this investigation, in my opinion, was a purposeful choice to not do the right thing.
What I find most troubling of all is the fact that you would choose to begin your testimony in front of a Jury and in front of me by-I don't even know how best to describe this, other than your lack of respect for the judicial system and the criminal justice system as a whole, you started your testimony with this mood of, "I have been in jail since the time of my arrest, I have two small kids and the reason is because the DA's office charged me with this," just complete lack of remorse.
You are in jail because of the choices you've made when Detective Johnson came to talk to you. You chose to give Detective Johnson a false name for Brandon Guidry.
That was a choice you made.
Your two small children, where were your two small children when you are driving this murderer to Miami? Where were your two small children when you are downing 22 shots by your own admission? Where were your two small children when you were living in some hotel?
That is a mother for you? That is how your mom raised you?
Your mom, unfortunately, is now saddled with raising your kids because of the choices you have made, you and you alone.
Now you want sympathy? What sympathy did you show to Ms. Hunn? What sympathy did you show to the Tims' family? You are on video.
It is undisputed. You were present and accounted for in full pixilated view watching the fight that ensued and you remember every single thing about the entire day except for the span of time from one video shot to the next. How convenient for you, Ms. Doucette.
I find that your entire testimony stretches the bounds of credibility. The thing I find most offensive is the fact that you would dare, under oath, to testify that the reason you lied about Brandon Guidry's name was because you were in fear of the victim's family. That is pathetic. That is even worse because not only are you going out of your way to assist Brandon Guidry, you are also going out of your way to trash someone that didn't even deserve to be shot down like a dog in the middle of the street. Not only are you helping, you are also stepping on this man for no reason.
So, Ms. Doucette, I have no sympathy, I really don't. Based on your prior conviction, as well as the complete lack of remorse you have shown to this Court, to the Jury, to the probation officer that did your PSI and to anybody else that asks, I'm sentencing you to serve eight years in the custody of the Department of Corrections.
MS. TIZZARD [defense counsel]:
Note my objection for the record.
*711 THE COURT:
Noted.
The original sentence is withdrawn. This is pursuant to Louisiana Revised Statute 15:529.1 and I am relying on Code of Criminal Procedure Article 894.1.
The Louisiana Supreme Court, in State v. Smith , 01-2574, pp. 6-7 (La. 1/14/03), 839 So.2d 1, 4, set forth the standard for evaluating a claim of excessive sentence:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to ... excessive ... punishment." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado , 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno , 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann , 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker , 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462, cf. State v. Phillips , 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906. (Emphasis added).
Ms. Doucette's sentence imposed in the case sub judice was within the range provided by the legislature. For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Soraparu , 97-1027 (La. 10/13/97), 703 So.2d 608 (quoting State v. Sepulvado , 367 So.2d 762, 767 (La. 1979) ).
In State v. Batiste , 06-0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, this Court further explained that a reviewing court may not set aside a sentence for excessiveness if the record evidences a factual basis for the imposed sentence, even if there has not been full compliance with La. C.Cr.P. art. 894.1 :
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry , [2003-1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235] supra ; State v. Trepagnier , 97-2427 (La. App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major , 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813 :
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos , 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the *712 circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Landry , 2003-1671 at p. 8, 871 So.2d at 1239. See also State v. Bonicard , 98-0665 (La. App. 4 Cir. 8/4/99), 752 So.2d 184.
Batiste , 06-0875, p. 18, 947 So.2d at 820.
The trial court articulated the basis for the sentence, finding Ms. Doucette was less than candid and evidenced no remorse. Ms. Doucette entered a plea of guilty to accessory after the fact to second degree murder and accessory after the fact to attempted second degree murder. Under Batiste , this Court must determine whether the sentence the trial court imposed is too severe in light of the particular defendant and the circumstances of the case. This Court must recognize that the maximum sentences are to be reserved for the most egregious violators of the offense charged. Id. , 06-0875, p. 19, 947 So.2d at 820.
Ms. Doucette entered a plea of guilty to assisting an individual who shot two men in the French Quarter, killing one and gravely injuring another. When questioned by the police, Ms. Doucette provided a false name for the shooter. In addition, Ms. Doucette assisted the shooter in absconding from the jurisdiction by driving him to Florida. The trial court articulated that Ms. Doucette lacked remorse and was "unremittingly false with everything you have done." The trial court found Ms. Doucette lacked credibility and blamed the fear of retaliation by the victim's family for her failure to give her co-defendant's correct name.
We find that the trial court did not abuse its discretion in sentencing Ms. Doucette to an eight-year sentence. Ms. Doucette entered a plea of guilty to one count of accessory after the fact to second degree murder and one count of accessory after the fact to attempted second degree murder. Ms. Doucette also admitted to being a second felony offender for multiple bill purposes. As such, Ms. Doucette failed to show that the trial court abused its discretion when it sentenced her to eight years imprisonment and her claim that the term imposed constituted excessive punishment lacks merit. Ms. Doucette's guilty plea and sentence are affirmed.
MR. GUIDRY
Motion to Suppress Identification
Mr. Guidry contends that the trial court erred in denying his Motion to Suppress Identification made by Mr. Joseph.
Mr. Joseph identified Mr. Guidry as the shooter in a six-person photographic lineup. Mr. Guidry contends the photographic lineup was unduly suggestive because his photograph was the only photograph in which a subject had a tattoo of a cross between his eyes.
In State v. Williams , 10-1197, pp. 9-10 (La. App. 4 Cir. 5/25/11), 66 So.3d 1207, 1213-14, this Court stated:
The law pertaining to the suppression of out-of-court identifications is well-settled:
La. Code of Criminal Procedure art. 703(D) provides that the defendant has the burden of proof on a motion to suppress an out of court statement. To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm , 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Robinson , 386 So.2d 1374, 1377 (La.1980). Moreover, a defendant who seeks to *713 suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Valentine , 570 So.2d 533 (La.App. 4 Cir.1990).The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux , 98-1673 (La.9/8/99), 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite , 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy , 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification at trial. State v. Martin , 595 So.2d 592, 595 (La.1992). The U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite , Id. The corrupting effect of the suggestive identification itself must be weighed against these factors. Martin , 595 So.2d at 595.
In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Lewis , 2004-0227 (La.App. 4 Cir. 9/29/04), 885 So.2d 641, 652. A trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray , 2000-0959 (La.App. 4 Cir. 9/26/01), 797 So.2d 764.
quoting State v. Holmes , 05-1248, pp. 6-7 (La. App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161.
Mr. Guidry asserts that the photographic lineup was suggestive because he has a prominent facial tattoo of a cross between his eyes. In making the identification, Mr. Joseph stated he did not focus on the tattoo on Mr. Guidry's face, but rather, focused on his entire face. Mr. Joseph stated on cross-examination, specifically when questioned about the tattoo on Mr. Guidry's face:
They asked me to point out the guy who I recognized. I wasn't in it for the tattoos in his face and all that. I looked at him. That's the guy I had a dispute with and had a fight with. And who I saw shooting at me, and that's the guy who I was running at.... I'll never forget that face.
Counsel for Mr. Guidry asked Mr. Joseph whether he could have picked any of the other five photographs since they did not have tattoos on their faces to which Mr. Joseph replied:
I know who I saw shooting at me; who I had a fight with; who maced me; who I *714 had a conversation with; who I had a dispute with. That's the face I was looking for in any picture. It could have been a stack this big (demonstrating.)
A review of the photographs used in the photographic lineup reflects six photographs depicting individuals with similar facial features. Mr. Guidry's photograph has a smudge or cross between his eyebrows. However, photograph four has a smudge between the individual's eyebrows and, in photograph three, the individual has what appears to be a scar above his eyebrows and a facial teardrop tattoo. The photographs are similar and the tattoo on Mr. Guidry's face is not so prominent as to make the photographic line-up unduly suggestive.
In State v. Savoy , 501 So.2d 819, 821 (La. App. 4th Cir. 1987) this Court stated:
A defendant attempting to suppress an identification must prove 1) that the identification was unduly suggestive and 2) that there was a substantial likelihood of irreparable misidentification. State v. Prudholm , 446 So.2d 729 (La.1984).
A lineup is unduly suggestive if the identification procedure displays the defendant so that the witness' attention is focused upon the defendant. State v. Neslo , 433 So.2d 73 (La.1983) ; State v. Tate , 454 So.2d 391 (La.App. 4th Cir.1984). Strict identity of physical characteristics among those in the photos is not required. All that is necessary is a sufficient resemblance to reasonably test identification. State v. Smith , 430 So.2d 31 (La.1983) ; State v. Roberson , 445 So.2d 12 (La.App. 4th Cir.1983), writ denied 449 So.2d 1344 (La.1984).
There is no exact detailed criteria for a legitimate photographic lineup. Each case must be considered on its own facts. State v. Tonubbee , 420 So.2d 126 (La.1982), cert. denied 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).
The six color photographs were the same size and shape, depicting the head and upper chest of the individuals. All of the subjects were black males of similar skin tone and age with various degrees of facial hair. The defendant's photo shows a mole on his left cheek which is almost invisible.
In State v. James , 431 So.2d 1075 (La.App. 2d Cir.1983), writ denied, 439 So.2d 1076 (1983), the defendant had a facial tattoo which had been noted by the victim in her description of her assailant. The court of appeal found the tattoo was not readily apparent in the defendant's photograph and it was not unduly suggestive. The Second Circuit noted that even if the tattoo had been visible the lineup would not be automatically invalidated.
A similar result was reached by this court in State v. Buchanan , 463 So.2d 660 (La.App. 4th Cir.1985). Although the defendant was the only person in the photo lineup with a tattoo on his hand, we noted the tattoo was hardly noticeable and concluded the lineup was not unduly suggestive. Buchanan considered the reliability factors and affirmed the denial of the motion to suppress.
* * *
Even if the photo identification could be considered suggestive, that alone would not violate the defendant's right to due process. There must also be a likelihood of misidentification which requires five factors to be considered.
These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the *715 corrupting effect of the suggestive identification itself.
quoting State v. Guillot , 353 So.2d 1005, 1008-09 (La. 1977), quoting Manson v. Brathwaite , 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).
Mr. Joseph's identification of Mr. Guidry in the present case was reliable, and thus, admissible. There is no dispute that Mr. Joseph had a good look at his assailant. The street and exterior lights outside the Famous Door illuminated the scene of the shooting. Mr. Joseph testified that he saw the shooter walk down Bourbon and raise a gun from his waist and that he "got a good clear look at his face." Mr. Joseph immediately recognized the shooter as the same man with whom he had gotten into a fight approximately thirty minutes earlier at the Last Call. Mr. Joseph provided a description to the police of the cross tattooed between the shooter's eyes. Mr. Joseph testified that he would "never forget that face." Mr. Joseph further identified Mr. Guidry in court.
According to Mr. Guidry, another man named Gerald Arnold committed the shooting. Mr. Guidry contends that Mr. Joseph misidentified him as the shooter. However, Mr. Joseph testified that he knew Mr. Arnold ("Network") for "a few years" "from hanging out in the Quarter" and identified "Network" in a photograph depicting Mr. Arnold, which was introduced into evidence. All of these factors establish that the identification of Mr. Guidry by Mr. Joseph was reliable, and that there was no substantial likelihood of misidentification. Therefore, Mr. Guidry's assertion lacks merit.
PROBABILITY OF MISIDENTIFICATION
Mr. Guidry contends the trial court erred in denying him the opportunity to present evidence of the probability of misidentification when identity was a key issue at trial. Mr. Guidry avers the trial court denied attempts by his counsel to introduce various photographs of Mr. Arnold in support of the defense's claim of misidentification into evidence.
During the testimony of Det. Johnson, counsel for Mr. Guidry sought to introduce an article from the newspaper showing a photograph of Mr. Arnold so as to compare his appearance to that of Mr. Guidry. The State objected to the article and photograph marked as D-3 and the trial court judge sustained the objection. The article and photograph were not allowed to be introduced into evidence.
La. C.E. art. 901(A) provides, the authentication requirement for admissibility "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Further, La. C.E. art. 901(B) provides a non-exclusive list of methods for authenticating evidence. One method for authenticating evidence is testimony by a witness with knowledge that the "matter is what it is claimed to be." La. C.E. art. 901(B)(1).
It is well settled that a photograph need not be identified by the person who took it to be admissible. The proper foundation for the admission of a photograph into evidence is laid when a witness having personal knowledge of the subject depicted by the photograph identifies it as such. State v. LeBlanc, 10-1484, p. 22 (La. App. 4 Cir. 9/30/11), 76 So.3d 572, 586. Determining the proper use of photographs at trial is generally within the sound discretion of the trial judge. State v. Kelly , 362 So.2d 1071, 1077 (La. 1978) ; State v. Allen , 00-0346, pp. 20-21 (La. App. 4 Cir. 10/17/01), 800 So.2d 378, 390.
Counsel for Mr. Guidry failed to lay a proper foundation necessary to authenticate the photographs: that is, that *716 the witness had personal knowledge of the subject depicted by the photograph in order to identify the subject depicted therein as Mr. Arnold. Additionally, the newspaper article sought to be introduced contained hearsay. Accordingly, the trial court properly excluded the photographs of Mr. Arnold tendered by the defense. Even if improperly excluded, the error was harmless because during the testimony of Mr. Joseph, the State introduced a photograph of Mr. Arnold. Mr. Joseph indicated he knew Mr. Arnold for several years as both were frequent visitors to the French Quarter.
Counsel for Mr. Guidry offered another photograph of Mr. Arnold during the testimony of Ms. Doucette, which he numbered as D-5. A discussion regarding the defense exhibits then took place outside the presence of the jury. Because D-3 and D-4 were newspaper articles and D-6 was a booking record, the admissibility of the exhibits was challenged. The trial court denied the introduction of these photographs because one was attached to a newspaper article detailing Mr. Arnold's death in an unrelated shooting in the French Quarter, which the trial court concluded contained hearsay. The other photograph Mr. Guidry sought to introduce of Mr. Arnold was attached to his criminal record, which the trial court found prejudicial.
The record reflects a photograph of Mr. Arnold was shown to Mr. Joseph. Mr. Joseph stated he knew Mr. Arnold as "Network" and had known him for years. As such, we find that Mr. Guidry failed to demonstrate how he was prejudiced by the trial court's refusal to allow the additional photographs of Mr. Arnold into evidence. The allegation concerning misidentification was placed before the jury. The jury rejected the allegation. Therefore, Mr. Guidry's contention lacks merit.
VIDEO OBSERVATION
Mr. Guidry contends the trial court erred in not allowing him to be placed where he could completely observe the videos at trial. Mr. Guidry asserts the trial judge refused to allow him to move from the defense table and sit in another part of the courtroom during the State's presentation to the jury of various surveillance videos, thereby denying him of his right to be present during trial guaranteed pursuant to La. C.Cr.P. art. 831.
Under La. C.Cr.P. art. 831(A)(5), a defendant in a felony prosecution is required to be present at all proceedings when the jury is present. La. C.Cr.P. art. 831(A)(5) provides: "[A] defendant charged with a felony shall be present ... [i]n trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced."
During the playing of the initial video, counsel for Mr. Guidry sought permission for Mr. Guidry and his attorney to move in order to see the video. The court granted permission and then requested the attorneys approach the bench. What occurred afterwards is not contained in the record. Mr. Guidry has not identified any prejudice suffered as a result of his alleged inability to view the surveillance tapes. Further, Mr. Guidry's counsel expressly stipulated to the authenticity and admissibility of the surveillance tapes. Accordingly, we find that Mr. Guidry's averments lack merit.
DECREE
For the above mentioned reasons, we find that Ms. Doucette's sentence was not excessive. Her guilty plea and sentence are affirmed. Further, we do not find that the trial court erred by denying Mr. Guidry's Motion to Suppress the Identification because it was not unduly suggestive. Further, the trial court has broad discretion *717 concerning the admittance of photographs and a picture of Mr. Arnold was already admitted into evidence. Lastly, Mr. Guidry did not demonstrate that he suffered prejudice as a result of allegedly not being able to completely view the videos at trial. Therefore, Mr. Guidry's convictions and sentences for Count 1, second degree murder, and Count 2, attempted second degree murder, are affirmed.
AFFIRMED
LOBRANO, J., CONCURS IN THE RESULT

Det. Johnson testified based on photographic evidence of the scene.

Ms. Williams did not testify at Mr. Guidry's trial.