STATE OF LOUISIANA IN     \*     NO. 2023-CA-0409
THE INTEREST OF K.B.

            \*     COURT OF APPEAL

            \*     FOURTH CIRCUIT

            \*     STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2022-339-02-DQ-C, SECTION "C"
Honorable Candice Bates Anderson, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Rosemary Ledet, Judge Dale N. Atkins, Judge Nakisha Ervin-Knott)


Jason Rogers Williams
DISTRICT ATTORNEY, ORLEANS PARISH
Patricia Amos
ASSISTANT DISTRICT ATTORNEY, ORLEANS PARISH
619 South White Street
New Orleans, LA 70119


       COUNSEL FOR APPELLEE, The State of Louisiana


Katherine M. Franks
LOUISIANA APPELLATE PROJECT
P.O. Box 220
Madisonville, LA 70447


       COUNSEL FOR APPELLANT, K.B.

    **AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH
INSTRUCTIONS
SEPTEMBER 26, 2023**

DNA

RML

NEK

This is a juvenile delinquency matter. Appellant, K.B.,[1] seeks review of the trial court's March 20, 2023 judgment, which adjudicated him delinquent of two counts of armed robbery with the use of a firearm and rendered a disposition of juvenile life regarding both counts. For the following reasons, we affirm K.B.'s adjudication of delinquency but vacate his disposition and remand with instructions.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

According to its Appellee Brief, the State of Louisiana ("State") originally filed a delinquency Petition against juvenile D.J.[2] However, when D.J. appeared in court to answer the Petition, the juvenile court also permitted the State to amend the Petition to reflect a co-perpetrator, K.B. The State followed up by filing an Amended Petition, which included counts relative to K.B. and the location of the offenses.[3] The charges alleged against K.B. were:

---

[1] Pursuant to the requirements of confidentiality in juvenile proceedings as set forth in La. Ch. C. Art. 412, as well as in Uniform Rules, Courts of Appeal, Rules 5-1 and 5-2, the juvenile is referred to by his initials only, K.B.

[2] As discussed further in this Opinion, the juvenile court adjudicated D.J. delinquent in a joint adjudication hearing with K.B. on March 20, 2023. D.J. has separately appealed, and his appeal is on this Court's docket under a different docket number.

[3] The Amended Petition contained in the record before this Court lacks a file stamp and a signature from the District Attorney's Office. Also, the Amended Petition in the record before

**COUNT 1: LA R.S. 14:64.3[4]**
relative to **ARMED ROBBERY WITH THE USE OF A FIREARM**,
to wit:
[D.J.] and [K.B.], on or about November 29, 2022, did commit armed robbery upon YVETTE ALFONSO [("Ms. Alfonso")][5] with the use of a firearm, at or near the INTERSECTION OF SOUTH CORTEZ STREET and GRAVIER STREET, in the Parish of Orleans.

. . . .

**COUNT 4: LA R.S. 14:64.3**
relative to **ARMED ROBBERY WITH THE USE OF A FIREARM**,
to wit:
[K. B.], on or about November 29, 2022,[6] did commit armed robbery upon ANTHONY WILLHIDE [("Mr. Willhide")] while armed with a dangerous weapon, at or near 3443 ESPLANADE AVENUE, in the Parish of Orleans.

K.B. ultimately pled not guilty to these counts.[7] The juvenile court held the adjudication hearing for both K.B. and D.J. on March 20, 2023. K.B. and D.J. were represented by separate counsel at the hearing.

**March 20, 2023 Adjudication Hearing**

---

this Court is dated December 4, 2022. However, in a pleading filed with the juvenile court by the State, the State explains that it "submitted an amended petition into PBK on December 30, 2022." (The State does not explain to what "PBK" refers.) Further, according to the juvenile court as transcribed during the March 20, 2023 hearing, the State filed the Amended Petition on January 3, 2023. A copy of the Amended Petition dated January 3, 2023, is not in the record though.

[4] Louisiana Revised Statutes 14:64.3 is titled "[a]rmed robbery; attempted armed robbery; use of firearm; additional penalty."

[5] In his Appellant Brief, K.B. uses the spelling "Alphonso." This Opinion will use the spelling "Alfonso" as in the Amended Petition in the record.

[6] The record is unclear as to which date the armed robbery with the use of a firearm as committed against Mr. Willhide occurred. The Amended Petition in the record lists the date as November 29, 2022; but during their testimony, as discussed more fully later in the Opinion, Mr. Willhide and Detective Anthony Lunn both stated that the incident occurred on November 28, 2022.

[7] At the March 20, 2023 adjudication hearing, which is discussed more fully throughout the Opinion, counsel for K.B. explained that she had never received a copy of the Amended Petition. After receiving a copy at the hearing, she entered a denial on K.B.'s behalf to both counts.

2

*Mr. Willhide's Testimony*

The State's first witness was Mr. Willhide, who testified that he worked part time as a driver for Uber and that he was working in this capacity on the evening of November 28, 2022. Regarding that evening, Mr. Willhide explained that around 10:00-11:00 PM, he was on a break in the parking lot of the Esplanade at City Park apartments in New Orleans. Mr. Willhide testified that during his break, he was sitting in his vehicle with the doors locked and a window cracked when someone approached the vehicle and said to him, "[G]ive me all of your stuff or [I am] going to shoot you in the face." Further, Mr. Willhide testified that a second voice said, "Yeah" and that guns were pointed at him from the direction of both voices. Mr. Willhide described both guns as handguns: he testified that one had "an extended magazine" and the other was a "very heavy handgun." At that point, according to Mr. Willhide, he began "handing [over his] stuff," and the two individuals ultimately drove his vehicle out of the parking lot. Further, Mr. Willhide testified that one of the individuals was wearing a "solid black hoodie" while the other wore a "black hoodie with red." Additionally Mr. Willhide testified that, on the date of the armed carjacking, his vehicle had a dashboard camera "for insurance purposes and for recording the safety of . . . passengers and to have a transparent third-party operation of what was to go on in [the] vehicle at all 360-degree angles frontwards, inside the cab, and outside the rear." When asked whether it was recording on the night of the armed carjacking, Mr. Willhide responded that "[a]s soon as my car [went] into park it automatically start[ed] recording."

The juvenile court asked Mr. Willhide whether he "g[a]ve anyone permission to approach [his] vehicle;" "g[a]ve anyone permission to enter [his]

3

vehicle;" and "g[a]ve anyone permission to use [his] vehicle" during his break on the date of the armed carjacking. Mr. Willhide stated that he did not give anyone permission to approach his vehicle, enter his vehicle, or use his vehicle while he was on his break that day. Mr. Willhide explained that although his vehicle was eventually recovered, "[t]here was nothing left in the vehicle when [he] got it, not even a car battery."

***Detective Anthony Lunn's Testimony***

As its next witness, the State called Detective Anthony Lunn ("Detective Lunn"), who explained that he worked in the Third District Investigations Unit of the New Orleans Police Department ("NOPD"). Detective Lunn testified that he was working in that capacity when he conducted a follow-up investigation[8] of an armed carjacking that had occurred on November 28, 2022, at 3443 Esplanade Avenue in New Orleans. Regarding the follow-up investigation, Detective Lunn stated that "[w]hen we were on scene, we did find a dash[board] camera that was . . . laying in the middle of the street when we got there, and we collected that and confirmed that it was from [Mr. Willhide]'s car." Counsel for the State asked Detective Lunn how he confirmed that the dashboard camera was from Mr. Willhide's car, and Detective Lunn began to respond, "I believe my sergeant noticed it was a dash[board] camera, so he contacted the officer and asked him if he had - - ." At that point, counsel for K.B. objected on hearsay grounds.[9]

Thereafter, counsel for the State instead asked Detective Lunn whether he had the opportunity to review the footage recovered from the dashboard camera,

---

[8] When asked what constituted his follow-up investigation, Detective Lunn explained that this entailed "anything after the first incident report. . . . [An] officer [took] the first incident report and then everything afterwards I handled that from there on."

[9] The transcript reveals that the juvenile court did not rule on the objection. Instead, counsel for the State asked a different question of Detective Lunn.

and Detective Lunn answered affirmatively. Detective Lunn described what he saw when he reviewed the dashboard camera footage:

> So the video footage showed -- it had three angles in the car. One angle was at the driver seat, the other showed basically the front of the vehicle, and then the last one showed the back, like, rear - - rear seats. And the [camera angle] showing the driver seat showed the victim kind of sitting in his car listening to music and then a male walks up to the window, points a gun in his face, demands him out of the car. And then . . . a second subject come[s] up basically both of them demanding him out of the car. And then the front video showed - - you could hear them having the altercation and then you see one of the males go across the front of the car. This one I guess was actually in color and you could see a red hoodie and he was armed with a firearm as he walked around the car and then got into the passenger seat.
>
> . . . .
>
> I guess they knew that it was a dash[board] camera video because one of them said, "oh, make sure you throw that out", and he ripped it off. And in the process of ripping [the dashboard camera] off it actually got a picture of one of their faces. He was wearing a mask, but from his nose to his forehead was - - [visible] . . . .

Detective Lunn testified that he was able to capture a still image from the dashboard camera footage and eventually identified the individual "through some other districts [sic] investigations." At that point, Counsel for K.B. objected to "any additional investigations" on *Prieur* grounds,[10] but counsel for the State responded, "[it is] specifically investigation of this particular case." The juvenile court allowed Detective Lunn to continue testifying. Detective Lunn then explained that he identified the individual in the image from the dashboard camera footage as K.B. When asked "[i]s he present in Court today," Detective Lunn identified K.B. in the courtroom.

---

[10] *See State v. Prieur*, 277 So.2d 126, 128 (La. 1973) (stating, in pertinent part, that "[e]vidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exceptions," namely "acts relevant to show intent, knowledge or system.")

Detective Lunn further explained that he did not conduct a line-up with Mr. Willhide because Mr. Willhide had informed officers "that he [was not] able to really see" the perpetrator, such that "he [would not] be able to recognize" the perpetrator "because he was wearing a mask and it happened so quick[ly]." Detective Lunn stated that despite the lack of a line-up identification, "we had the camera view . . . to see."

***Detective Anita McKay's Testimony***

The next witness to testify for the State was Detective Anita McKay ("Detective McKay"), who identified herself as an employee of the First District Investigative Unit for the NOPD. Detective McKay testified that on December 5, 2022, she was working in that capacity to investigate an armed carjacking that had occurred on November 29, 2022, at South Cortez and Gravier Streets in New Orleans.[11] When asked whether she collected any evidence during the course of her investigation, Detective McKay replied, "[O]nce I read the initial police report written [by] Officer Jones I went to the actual location of occurrence and the victim was no longer there because of the timeframe. However, the supervisor was, and she advised me that the building was equipped with video - - ." Counsel for K.B. and D.J. both objected on hearsay grounds, arguing "[she is] talking about somebody [that is] not present and what their out of [c]ourt statements are." Before the juvenile court ruled on the objection, counsel for the State replied that he would rephrase the question.

Subsequently, counsel for the State asked Detective McKay whether she knew to "go to the location of South Cortez" and if she collected any evidence

---

[11] Based on her testimony, Detective McKay became involved in the investigation on the same day as the carjacking. She testified that "[t]he actual crime happened at about 6 - - between 6 and 6:30. I got in about 9 and was assigned the case via my supervisor."

while she was there. In response, Detective McKay answered both questions affirmatively, explaining that she was able to collect video surveillance footage at the location of the carjacking. Further, Detective McKay testified she reviewed that video surveillance footage and began to describe what she had seen in the footage, stating that "[t]he victim arrived at the location and prior to her exiting the vehicle another vehicle pulled alongside of her vehicle. A male exited the . . . passenger side of that vehicle, opened up her door - - ." Counsel for K.B. and D.J. both objected on the basis that Detective McKay was "testifying to what is in this video and the video has not been introduced into evidence." K.B.'s counsel also argued that the video itself "would be the best evidence." The juvenile court overruled the objection and permitted Detective McKay to proceed with her testimony, at which point she continued describing what she had seen on the video surveillance footage:

> So there was a gentleman clad in a red hoodie/shirt and he opened up the driver door of the victim's vehicle and he was armed with a firearm, reached in and pulled her from the vehicle. The victim began to scream in a panic. Another guy exited the driver seat who had on a very distinctive face mask. He came around as if he was going to assist the other gentleman. And there was a third person who had his arm reached out of a partially cracked window from the rear seat. Once the victim was fully out of her vehicle, the guy in the red shirt, he gets in her vehicle and the two vehicles fled the location behind one another.

Thereafter, when asked whether she would be able to identify that footage if it were shown to her, Detective McKay answered affirmatively, and counsel for K.B. objected on the basis that there was "no foundation laid by the custodian of this particular video," such that its authenticity was in question because the "foundation ha[d] not been laid." The juvenile court noted the objection for the record, and the following colloquy occurred:

7

[COUNSEL FOR D.J.]:

And, Judge, I think at this point she can look at it. I would ask as the trier [of] fact, obviously, that you cannot see it until it is offered and admitted at which point if the State attempts to do that I have an objection I would like to make, but I think [it is] premature at this time.

THE COURT:

Okay. It is. Thank you, Counselor.

Subsequently, counsel for the State asked questions of Detective McKay "to authenticate the video" while showing video surveillance footage on a screen, at which point counsel for the State asked Detective McKay the following questions:

Q     Would you, please, describe to me what you see on the screen?

A     The white vehicle that was for the victim properly parked at the corner of Gravier and South Cortez.

Q     Okay. Did you have the actual opportunity to see the specific road?

A     Yes.

Q     Okay. During that day when you got the surveillance video?

A     Yes.

Q     Okay. So how are you able to identify [it as] being that street?

A     I work in the area. [I am] familiar with the area.

Q     Okay. But, like, what things in the video help you to identify that?

A     The building that the camera is affixed on and it being in the area — [it is] right across from the Entergy building. I have knowledge of the entire area.

Q     And is there a time stamp on the video?

A     Yes.

Q     Okay. What date and time does it display?

8

A     [It is] saying November 29, 2022, 7:26 a.m.

Then, the State offered the video surveillance footage into evidence, at which time counsel for K.B. and counsel for D.J. objected again. They argued that, under La. C.E. art. 901, "without having the actual person who maintains the video system and can testify to the accuracy and the maintenance thereof, this video cannot come into evidence." The juvenile court overruled their objections and admitted the video surveillance footage into evidence.

Thereafter, when asked what the next step in her investigation was, Detective McKay responded, "Once we got the video surveillance [footage], we also began to get phone calls from detectives across our city with our [Violent Crime Abatement Investigation Team ("VCAIT Unit")[12]] as well." Counsel for K.B. and counsel for D.J. both objected on the basis of *Prieur* and contended that Detective McKay's testimony constituted hearsay. Before the juvenile court ruled on that objection, counsel for the State asked Detective McKay whether she had been able to identify the suspects in the video surveillance footage. Again, counsel for K.B. objected on the basis of hearsay, but the juvenile court stated, "[It is] premature. [I am] going to allow [Detective McKay] to answer the question." In response to the question as to whether she was able to identify the individuals in the video surveillance footage, Detective McKay answered affirmatively,

---

[12] We note that Detective McKay used the acronym "VCAIT" during her testimony, but she did not explain what those letters represent. However, this Court may take judicial notice of government websites. *Mendoza v. Mendoza*, 2017-0070, p. 6 (La. App. 4 Cir. 6/6/18), 249 So.3d 67, 71 (citing *Felix v. Safeway Ins. Co.*, 2015-0701, p. 7 (La. App. 4 Cir. 12/16/15), 183 So.3d 627, 632 & n.10). *See also* La. C.E. art. 201. A press release on the website for the United States Attorney's Office for the Eastern District of Louisiana states that "VCAIT" stands for "Violent Crime Abatement Investigation Team." *See U.S. Attorney's Office, Eastern District of Louisiana Joins Its Federal, State and Local Law Enforcement Partners in Addressing Violent Crime*, JUSTICE.GOV (Feb. 16, 2022), https://www.justice.gov/usao-edla/pr/us-attorney-s-office-eastern-district-louisiana-joins-its-federal-state-and-local-law.

explaining that she and the other investigating officers "learned of a social media account" after having obtained the video surveillance footage. Counsel for K.B. and counsel for D.J. again objected, contending that any social media evidence constituted hearsay and that the State had not authenticated the evidence. The juvenile court noted the objection for the record but allowed the State and Detective McKay to proceed. When shown State's Exhibit 3, Detective McKay identified it as a "still image that [she and other investigating officers] obtained from social media" and described it as displaying a "young man wearing a very distinctive full[-]faced mask." Detective McKay explained that during "[her] investigation with additional detectives that came on board to assist [her]" she identified the social media user as D.J.[13]

Detective McKay then testified that "[t]hrough [her] investigation with other detectives [she] obtained a still image photo of the other subject," which image came from the "car dash[board] cam[era] from another vehicle that was violently taken in an armed carjacking." Thereafter, the State asked for permission to authenticate, which the juvenile court granted: the State showed State's Exhibit 4 to Detective McKay, and she identified it as "[a] still image photo from the in car dash[board] cam[era] that [she and the other investigating officers] received during [their] investigation." When asked to expand further on the identification process, Detective McKay explained that "[they] were working together as detectives on these cases and the photo was provided to further [her] investigation." When asked who was in the still image, Detective McKay responded, "K.B." and identified

---

[13] Counsel for D.J. objected to this identification based on "the lack of foundation" and argued that Detective McKay could not "testify to something that other detectives have done." Overruling the objection, the juvenile court responded, "[Detective McKay] just stated that she was part of the investigation."

K.B. in the courtroom. Counsel for K.B. objected to the photo being admitted into evidence on the basis that "[i]t was received from another detective that never authenticated it." The juvenile court noted the objection but admitted the photo into evidence.

On cross-examination, counsel for K.B. asked Detective McKay whether she conducted "a line-up procedure" with the complaining witness, Ms. Alfonso, and Detective McKay responded that she did not conduct a line-up. Further, when asked if "conduct[ing] a line-up to get confirmation of the actual complainant" is standard procedure, Detective McKay responded, "[n]ot all the time." When pressed why she did not conduct a line-up, Detective McKay answered: "In this particular case because we had so many hands-on detectives and the two persons that were involved and identified were not strangers to the system in being identified by myself and other detectives from previous cases."

***Detective April Augustine's Testimony***

Finally, the State called Detective April Augustine ("Detective Augustine") as a witness, and she testified that she was a police officer with the NOPD assigned to the VCAIT Unit. Detective Augustine explained that she was working in this capacity on November 30, 2022, at which time she investigated an armed carjacking that had occurred on November 29, 2022, at approximately 6:20 a.m. at South Cortez and Gravier Streets. When asked how she became involved in the investigation, Detective Augustine explained that she and her partners "spotted the [stolen] vehicle" and "decided to follow it until it became stationary so [that they] could try to make an apprehension on the person that was driving the stolen vehicle." Detective Augustine testified that "[o]nce [the vehicle] was parked" she and her partners "observed [a] . . . male" and "had knowledge of the person

11

through . . . previous investigation." Thereafter, according to Detective Augustine, the individual went into a barber shop, at which time she assisted with securing the perimeter. Detective Augustine testified that "[a]fter he exited the barber shop, [the individual] was apprehended" and "then [she] . . . secured the stolen [vehicle]."

Further, Detective Augustine explained that other "[o]fficers . . . confiscate[d] [a] gun and then they brought it to [her] and [she] secured the firearm in [her] vehicle temporarily." When the State showed State's Exhibit 5 to Detective Augustine, she identified it as a "[b]lack semi-automatic handgun with an extended magazine." She testified that it had a label containing an item number that matched the number assigned to the carjacking at South Cortez and Gravier Streets, and she stated that was the firearm collected on November 30, 2022, outside of the barber shop. Detective Augustine clarified that another officer handed her the gun on November 30, 2022, and that although she was on the scene, she was not present when that gun was actually recovered by a member of the NOPD because she was securing the perimeter at that time.

Detective Augustine's testimony reveals that the individual detained on November 30, 2022, was D.J.; however, Detective Augustine clarified that she did not see D.J. driving the stolen vehicle, did not see D.J. park the stolen vehicle, and did not see D.J. get out of the stolen vehicle. Rather, Detective Augustine testified that she saw D.J. walk toward the barber shop and that she was located on a side street when D.J. exited the barber shop.

**March 20, 2023 Judgment**

After hearing closing arguments, the juvenile court proceeded to adjudicate K.B. delinquent on Count 1 and Count 4. After the juvenile court stated D.J.'s adjudication too, the following colloquy occurred:

THE COURT:

. . . Do you wish to waive delays?

[COUNSEL FOR D.J.]:

Yes.

THE COURT:

All right. With [K.B.] it is ordered, adjudged, and decreed that you are a juvenile for proper placement with the Office of Juvenile Justice. You are hereby placed with the Office of Juvenile Justice. How old are you? Where are you? How old?

[K.B.]:

17.

THE COURT:

17. On the one count of armed robbery; juvenile life. On the second count of armed robbery with the use of a firearm; juvenile life. All to run concurrent.

The same day as the hearing, March 20, 2023, the juvenile court signed a judgment, which stated in pertinent part:

**DELINQUENT ADJUDICATION**

It is [**ORDERED, ADJUDGED AND DECREED**] that [**K.B.**] was a child under seventeen (17) years of age . . . at the time of the offense(s) herein and is within the purview of the Children's Code and hereby found to be **DELINQUENT** as a result of having committed the following offense(s):

COUNT NUMBER          OFFENSE
14:64 Armed robbery; use of firearm (2 counts) (Count 1 and 4)

**DISPOSITION**

It is [**ORDERED, ADJUDGED, and DECREED**] that the juvenile is a proper person for placement with the Office of Juvenile Justice and is hereby with the Office of Juvenile Justice for **JUVENILE LIFE as to each count. Said sentences are to run concurrent and run concurrent with any other open cases.**

13

On April 19, 2023, K.B. filed a Motion for Appeal regarding the March 20, 2023 judgment.

## ASSIGNMENTS OF ERROR

K.B. asserts the following four assignments of error:

1. The [juvenile court] erred in admitting the video of the carjacking of the person identified as Ms. Alphonso [sic] when the State failed to lay the proper foundation for its admission. As Ms. Alphonso [sic] did not testify, the video was the sole evidence that an offense even occurred. The error therefore was not a harmless one.

2. It was error for the [juvenile court] to allow Detective McKay to testify as to the content of the inadmissible video allegedly depicting the carjacking of Ms. Alphonso [sic]. Not only was the testimony, in light of the lack of evidence of the original video's loss or destruction, not the "best evidence" as to the content of the video, Detective McKay was also incompetent to testify as to the video's content.

3. The [juvenile court] erred in allowing both Detective McKay and Detective Lunn to offer hearsay testimony regarding the identification of K.B. as the perpetrator of both offenses charged in the delinquency petition. The testimony of both detectives made it clear that the identifications were made by unidentified third parties. The use of hearsay to establish identity was so prejudicial that a new trial is mandated.

4. Patent Error - The [juvenile court] erred in failing to conduct a disposition hearing and then imposing a non-mandatory maximum disposition without a waiver of the hearing by either K.B. or his counsel.

Before discussing K.B.'s assignments of error, we must address some preliminary matters.

## PRELIMINARY MATTERS

**Whether K.B.'s Appeal Was Timely Filed**

As noted previously, the juvenile court signed the subject judgment on March 20, 2023, and K.B. filed the instant appeal on April 19, 2023. Louisiana Children's Code Article 332(A) provides that "appeals shall be taken within fifteen

days from the mailing of notice of the judgment."[14] Because the record before this Court did not contain a notice of judgment, on August 7, 2023, this Court ordered the Clerk of Court for the Orleans Parish Juvenile Court ("Juvenile Court Clerk") to supplement the record with the notice of judgment regarding the March 20, 2023 judgment, so that we could determine whether this appeal was timely filed. In response, this Court received a March 21, 2023 email chain, and the Juvenile Court Clerk explained to this Court's Clerk that this is the email by which counsel for K.B. received the March 20, 2023 judgment. The Juvenile Court Clerk did not file with this Court anything demonstrating that the Juvenile Court Clerk mailed the judgment to K.B. and his counsel. In order to resolve whether K.B.'s appeal was timely filed, we must determine whether the March 21, 2023 email was sufficient to initiate the fifteen-day deadline for filing an appeal under La. Ch. C. art. 332(A): if it was sufficient, then K.B.'s appeal was untimely.

In *State in Interest of A.S.*, the juvenile court signed the subject judgment on November 14, 2016, and on the next day, November 15, 2016, the sheriff's office

---

[14] Regarding the computation of time in juvenile matters, La. Ch. C. art. 114 provides:

        A. In computing a period of time allowed or prescribed by law or by order of court, the date of the act, event, or default after which the period begins to run is not to be included. The last day of the period is to be included, unless it is a legal holiday, in which event the period runs until the end of the next day which is not a legal holiday.

        B. A half-holiday is considered as a legal holiday.

        C. A legal holiday is to be included in the computation of a period of time allowed or prescribed, except in any one of the following instances:

        (1) It is expressly excluded.

        (2) It would otherwise be the last day of the period, except that, for purposes of calculating a release date from an order of commitment, a legal holiday shall be included if it is the last day of the period.

        (3) The period is less than seven days.

        D. All Saturdays and Sundays are also considered as legal holidays.

15

"walked" the judgment to counsel for the appellant. 2017-0028, p. 4 (La. App. 4 Cir. 5/10/17), 220 So.3d 179, 183. Counsel for the appellant filed a motion for appeal on December 5, 2016. *Id.* In response, the Department of Children and Family Services ("DCFS") argued that the appeal was untimely and that subject matter jurisdiction had lapsed as a result. *Id.* In response to that argument, this Court held:

> Article 332 of the Louisiana Children's Code states, in pertinent part, that "appeals shall be taken within fifteen days from the ***mailing*** of the notice of the judgment." (Emphasis added). The "starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The legislature is presumed to mean what it plainly says in the text of a statute. *Cat's Meow v. City of New Orleans*, [19]98-0601, p. 15 (La. 10/20/98), 720 So.2d 1186, 1198. "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *State v. Williams*, [20]10-1514, p. 6 (La. 3/15/11), 60 So.3d 1189, 1192. "When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written." *Id.* In the instant matter, the mailing of the judgment, not the custom or practice of the Sheriff's Office, marked the start of the time delay for filing a Notice of Appeal. Therefore, DCFS's argument that subject matter jurisdiction lapsed is without merit. We find the Notice of Appeal timely and as such, will consider the merits of [a]ppellant's appeal.

*Id.* at pp. 5-6, 220 So.3d at 183-84 (footnote omitted).

In addition to that precedent, we have not located any cases in which a court has held that an email is sufficient to initiate the fifteen-day period outlined in La. Ch. C. art. 332(A). As emphasized in *State in Interest of A.S.*, La. Ch. C. art. 332(A) specifies that the time period begins upon mailing of the judgment and does not provide emailing as an alternative method even if that is the custom of the Orleans Parish Juvenile Court. Additionally, "[a]ppeals are favored in law and any doubt shall be resolved in favor of maintaining, rather than dismissing an appeal." *Modicue v. Prince of Peace Auto Sale, LLC*, 54,095, p. 9 (La. App. 2 Cir. 9/22/21),

16

328 So.3d 1239, 1246 (citing *Morice v. Alan Yedor Roofing & Constr.*, 2016-532, p. 10 (La. App. 5 Cir. 2/8/17), 216 So.3d 1072, 1079). Accordingly, "[u]nless the grounds for dismissal are free from doubt, the appeal should be maintained." *Id. See also State v. Fin. Cas. & Sur.*, 2017-1014, 2018-0242, p. 7 (La. App. 4 Cir. 11/7/18), 318 So.3d 713, 717 (quoting *Garco, Inc. v. Rob's Cleaning & Powerwash, Inc.*, 2008-1249, p. 3 (La. App. 4 Cir. 4/22/09), 12 So.3d 386, 388) (noting that "[i]n the absence of the clerk's certificate showing the date of the mailing of the judgment and to whom it was mailed, doubt should be resolved in favor of the right to appeal"). In the matter *sub judice*, mailing of the judgment, not the custom or practice of the Juvenile Court Clerk of emailing the judgment, would have marked the start of the time delay for filing an appeal.

Therefore, we find that K.B. timely filed this appeal, and we will consider the merits of his appeal. Before proceeding with the merits, we must discuss two more preliminary matters.

**Applicability of the Louisiana Code of Criminal Procedure**

At the outset, we note that La. Ch. C. art. 104 states that "[w]here procedures are not provided in this Code, or otherwise by law, the court shall proceed in accordance with" the Louisiana "Code of Criminal Procedure in a delinquency proceeding and in a criminal trial of an adult." Additionally, La. Ch. C. art. 803, which is in the section of the Louisiana Children's Code labeled "Title VIII. Delinquency," provides that "[t]he provisions of this Title shall govern and regulate delinquency proceedings of courts exercising juvenile jurisdiction." If "procedures are not provided in this Title, or otherwise by [the Louisiana Children's] Code" though, "the court shall proceed in accordance with the Code of Criminal Procedure." La. Ch. C. art. 803. *See also State in Interest of C.H.*, 2021-

17

0516, p. 17 (La. App. 4 Cir. 1/26/22), 335 So.3d 451, 462. Thus, this Opinion will apply the Louisiana Children's Code when possible and the Louisiana Code of Criminal Procedure in the absence of an applicable Children's Code provision.

**Errors Patent Review**

In accordance with La. C.Cr.P. art. 920, we review appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2). Though the Louisiana Children's Code does not specify whether a juvenile proceeding is entitled to an errors patent review, this Court has found that La. Ch. C. art. 104 and La. C.Cr.P. art. 920, when read in conjunction with each other, mandate an errors patent review. *State in Interest of C.H.*, 2021-0516, p. 19, 335 So.3d at 463 (citing *State in Interest of A.P.*, 2020-0623, p. 6 (La. App. 4 Cir. 4/21/21), 317 So.3d 887, 890). Accordingly, in juvenile delinquency cases, this Court has adopted the practice of conducting an errors patent review. *Id.* (citing *State in Interest of W.B.*, 2016-0642, p. 4 (La. App. 4 Cir. 12/7/16), 206 So.3d 974, 978).

A review of the record for errors patent in this case reveals one: the juvenile court failed to conduct a disposition hearing. *See State in Interest of W.B.*, 2016-0642, pp. 4-6, 206 So.3d at 978-79 (wherein this Court held that the juvenile court's failure to conduct a disposition hearing prior to entering a judgment of disposition in the absence of a valid waiver constituted an error patent). We note that K.B. labels his fourth assignment of error as a "[p]atent [e]rror." Therein, he asserts that "the [juvenile] judge erred in failing to conduct a disposition hearing and then imposing a non-mandatory maximum disposition without a waiver of the hearing by either K.B. or his counsel." Accordingly, we will address this error

patent in our discussion of K.B.'s fourth assignment of error. Moreover, we note that K.B.'s first, second, and third assignments of error concern his adjudication of delinquency: if we were to determine that the trial court committed reversible error in adjudicating K.B. delinquent, then this would render moot any error regarding K.B.'s disposition.

***Assignment of Error Number One: Whether the Juvenile Court Erred in Permitting the Admission of the Videotape of the Carjacking of Ms. Alfonso Because the State Did Not Properly Authenticate or Identify the Video Surveillance Footage***

In his first assignment of error, K.B. contends that the juvenile court "judge erred in admitting the video of the carjacking of the person identified as Ms. Alphonso [sic] when the State failed to lay the proper foundation for its admission." Further, he asserts that because "Ms. Alphonso [sic] did not testify, the video was the sole evidence that an offense even occurred. The error therefore was not a harmless one."

**Standard of Review**

As this Court has explained, a trial court has great discretion in determining if a party has laid a sufficient foundation for the admission of evidence, and an appellate court reviews a ruling on the admissibility of evidence for an abuse of that discretion. *State v. Groves*, 2020-0450, p. 29 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 975 (citing *State v. Ashford*, 2003-1691, p. 14 (La. App. 4 Cir. 6/16/04), 878 So.2d 798, 806; *State v. Wright*, 2011-0141, pp. 10-11 (La. 12/6/11), 79 So.3d 309, 316). *See also State v. Chambers*, 2016-0712, pp. 12-13 (La. App. 4 Cir. 2/15/17), 212 So.3d 643, 651 (citing *Wright*, 2011-0141, pp. 10-11, 79 So.3d at 316); *State in Interest of J.H.*, 2022-0324, pp. 11-12 (La. App. 4 Cir. 8/9/22), 2022 WL 3210100, at *6 (citing *State v. Cosey*, 1997-2020, p. 13 (La. 11/28/00), 779 So.2d 675, 684; *Ashford*, 2003-1691, p. 14, 878 So.2d at 806).

**Authentication or Identification of Evidence**

"Authentication of evidence is required in order for evidence to be admissible at trial." *State v. Smith*, 2015-1359, p. 6 (La. App. 4 Cir. 4/20/16), 192 So.3d 836, 840. Louisiana Code of Evidence Article 901 is titled "[r]equirement of authentication or identification." It states, in pertinent part, that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." La. C.E. art. 901(A). Louisiana Code of Evidence Article 901(B) "provides an illustrative, though not exhaustive, list of examples of authentication or identification that conforms with the requirements of the article." *Smith*, 2015-1359, p. 6, 192 So.3d at 840. It states, in pertinent part:

> **B. Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Article:

20

(1) **Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.

. . . .

(4) **Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

. . . .

(9) **Process or system.** Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

La. C.E. art. 901(B). Additionally, this Court has held that "[t]he identification of the evidence may also be satisfied 'by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence.'" *State in Interest of J.H.*, 2022-0324, p. 11, 2022 WL 3210100, at *6 (quoting *State v. Martin*, 2013-0115, pp. 9-10 (La. App. 4 Cir. 12/4/13), 131 So.3d 121, 128).

A party establishes a sufficient foundation for the admission of a piece of evidence "when the evidence as a whole shows it is more probable than not that the object is one connected with the crime charged." *State v. Parks*, 2007-655, p. 17 (La. App. 5 Cir. 1/22/08), 977 So.2d 1015, 1028 (citing *State v. Arita*, 2004-39, p. 9 (La. App. 5 Cir. 3/1/05), 900 So.2d 37, 43). "The identification can be visual, through testimony." *Id.* "Generally, the standard applied by state and federal courts alike with respect to the authentication of a document is whether there is sufficient evidence from which a reasonable juror could find the proposed evidence is what the proponent claims it to be." *Smith*, 2015-1359, p. 6, 192 So.3d at 840 (citing *State v. Lee*, 2001-2082, p. 9 (La. App. 4 Cir. 8/21/02), 826 So.2d 616, 624).

21

This Court has held that "a photograph need not be identified by the person who took it to be admissible" and that "[t]he proper foundation for the admission of a photograph into evidence is laid when a witness having personal knowledge of the subject depicted by the photograph identifies it as such." *State v. Doucette*, 2017-0501, 0768, pp. 18-19 (La. App. 4 Cir. 5/23/18), 243 So.3d 704, 715 (citing *State v. LeBlanc*, 2010-1484, p. 22 (La. App. 4 Cir. 9/30/11), 76 So.3d 572, 586). *See also S.L.B. v. C.E.B.*, 2017-0978, 0979, 0980, p. 28-30 (La. App. 4 Cir. 7/27/18), 252 So.3d 950, 969-70. Similarly, the person who authenticates video footage need not be the one who originally recorded the video if the person has knowledge that the video is what the proponent claims it to be and can provide information about the content of the footage. *See Groves*, 2020-0450, pp. 28-32, 323 So.3d at 975-77; *State v. Gray*, 2016-1195, pp. 21-30 (La. App. 4 Cir. 6/28/17), ___ So.3d ___, ___, 2017 WL 3426021, at *11-16. For example, in *Gray*, the State sought to introduce certain YouTube videos into evidence and attempted to authenticate the videos by presenting the testimony of a detective who investigated social media evidence in search of crimes and gang activities. 2016-1195, p. 23, ___ So.3d at ___, 2017 WL 3426021, at *12. The detective identified the videos and made an in-court identification of the defendant as the person in the videos. *Id.* at pp. 23-25, ___ So.3d at ___, 2017 WL 3426021, at *12-13. The detective also provided the location of the videos and estimated that the videos were filmed sometime between 2010 and 2013. *Id.* On appeal, this Court concluded that the detective's testimony provided sufficient support for the district

court's finding that the YouTube videos were what the State claimed them to be and thus admissible. *Id.* at p. 30, ___ So.3d at ___, 2017 WL 3426021, at *16.[15]

Likewise, in the matter *sub judice*, Detective McKay recalled that she obtained the video surveillance footage in the course of her investigation of the carjacking of Ms. Alfonso, which occurred on November 29, 2022. Detective McKay explained that when she viewed the video surveillance footage that she obtained from the location of the carjacking (South Cortez and Gravier Streets), it showed one individual "in a red hoodie/shirt" who "opened up the driver door of the victim's vehicle" while "armed with a firearm" and "reached in and pulled [the victim] from the vehicle." Detective McKay testified that in the footage was "[a]nother guy . . . who had on a very distinctive face mask" and "came around as if he was going to assist the other gentleman." Continuing, Detective McKay explained that "[o]nce the victim was fully out of her vehicle, the guy in the red shirt, he gets in her vehicle and the two vehicles fled the location behind one another." Thereafter, when the State played the video surveillance footage, Detective McKay identified Ms. Alfonso's "white vehicle that was . . . parked at the corner of Gravier and South Cortez" Streets. Detective McKay testified that she recognized the location not only because she visited it during her investigation but also because she works in that area and is "familiar" with it. Specifically, Detective McKay identified the building on which the surveillance camera was affixed as "right across from the Entergy building." Detective McKay also identified the date and time stamp of the video as "November 29, 2022, 7:26 a.m.,"[16] thereby

---

[15] Though the discussion sections in *Groves* and *Gray* noted that these were social media videos, the reasoning and analyses found in those cases are applicable here too.

corresponding with the date and time of the carjacking of Ms. Alfonso. Additionally, Detective McKay stated that she subsequently identified the individuals in the video surveillance footage as D.J. and K.B.

Considering the foregoing, we find that Detective McKay's testimony was that "of [a] witness with knowledge" that the video is "what it is claimed to be" and that she provided "[d]istinctive characteristics and the like." *See* La. C.E. art. 901(B)(1),(4). Her testimony provided sufficient evidence from which a reasonable juror could find the video surveillance footage is what the proponent claims it to be. Thus, the juvenile court did not err in admitting the video surveillance footage into evidence based on Detective McKay's testimony serving as the basis for its authentication or identification.

**Case Cited by K.B.: *State in Interest of J.H.***

We further note that, in support of his first assignment of error, K.B. cites to *State in Interest of J.H.*, 2022-0324, 2022 WL 3210100. Therein, a panel of this Court reviewed the juvenile court's admission of video surveillance footage obtained by Detective Amit Bidichandani ("Detective Bidichandani") from the director of a housing development. *Id.* at pp. 2-3, 10-14, 2022 WL 3210100, at *1, 6-7. The Court summarized the detective's testimony as follows:

> Det[ective] Bidichandani obtained video surveillance footage from the director of the . . . [h]ousing [d]evelopment, Mr. Pollard. Det[ective] Bidichandani stated that, from his previous experience working in that area, he knew that the . . . [h]ousing [d]evelopment had surveillance cameras recording video in the area where the incident occurred. Det[ective] Bidichandani obtained from Mr. Pollard a video recording from the date, location, and approximate time of the reported incident. In the video, Det[ective] Bidichandani viewed a person, who fit the description from the witnesses, pulling a firearm from his waistband.

---

[16] We note that during her testimony at the March 20, 2023 hearing, Detective McKay estimated that the incident had occurred between "6 and 6:30."

*Id.* at pp. 2-3, 2022 WL 3210100, at *1. In holding that the juvenile court abused its discretion in admitting the footage into evidence, the Court emphasized that Detective Bidichandani "received a copy of an excerpt of a video recording from a third party who did not testify regarding the process or system by which the video was created" and that there was thus "no testimony regarding the accuracy of the video." *Id.* at p. 13, 2022 WL 3210100, at *7. The Court also observed that because "Det[ective] Bidichandani received this from a non-testifying third party, the chain of custody [was] not . . . properly established." *Id.*

However, we find the reasoning of *State in Interest of J.H.* distinguishable from the matter *sub judice*. First, as explained previously, the Court in *State in Interest of J.H.* concluded that the juvenile court abused its discretion because no one testified regarding the process or system by which the video was created. 2022-0324, p. 13, 2022 WL 3210100, at *7. Though La. C.E. art. 901(B)(9) lists "process or system" as a method of authenticating or identifying evidence, La. C.E. art. 901(B) specifically states that the list contained therein is "[b]y way of illustration only, and not by way of limitation" and that it constitutes a list of "examples of authentication or identification." Moreover, in other cases this Court has emphasized that La. C.E. art. 901(B) is not an "exhaustive" list. *See Smith*, 2015-1359, p. 6, 192 So.3d at 840. Thus, we find that citing to a party's failure to authenticate or identify evidence via one of the specific listed methods is an improper interpretation of La. C.E. art. 901(B).

Second, in so holding, the Court in *State in Interest of J.H.*, also stated that the State had not properly established the chain of custody. 2022-0324, p. 13, 2022 WL 3210100, at *7. However, in discussing chain of custody, the Court in *State in Interest of J.H.* also specifically stated that "[t]he identification of the evidence

*may* also be satisfied 'by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence.'" *Id.* at p. 11, 2022 WL 3210100, at *6 (emphasis added). Thus, like "process or system," the chain of custody is just another *potential* method for identifying or authenticating evidence. That is, the failure to authenticate or identify evidence in this matter does not mean that the evidence has not been properly or sufficiently authenticated or identified; therefore, the failure to authenticate or identify evidence via one of these listed methods should not automatically be deemed fatal by a court.

Additionally, it is worth noting that although the Court in *State in Interest of J.H.* listed La. C.E. art. 901(B)(1) and (4) in one of its opening rule statements about authentication and identification of evidence, the Court did not appear to consider whether these examples of methods of authentication or identification were applicable in the matter (i.e., (1) testimony of witness with knowledge and (4) distinctive characteristics and the like). 2022-0324, p. 11, 2022 WL 3210100, at *6). Yet, the Court summarized the State's argument about the authentication or identification of the footage in this regard:

> Det[ective] Bidichandani testified that he was familiar with the neighborhood of the . . . [h]ousing [d]evelopment, where the incident occurred; he knew to contact Mr. Pollard, the security director, about video surveillance; he retrieved the video footage from Mr. Pollard; and, from "previous experience collecting video footage from this area", he knew "that their camera systems and layout is accurate."

*Id.* at p. 13, 2022 WL 3210100, at *6. However, the Court did not discuss La. C.E. art. 901(B)(1) and (4) in its analysis or explain why Detective Bidichandani's testimony to this effect failed to satisfy La. C.E. art. 901(B)(1) and/or La. C.E. art. 901(B)(4).

26

Finally, the Court in *State in Interest of J.H.* appears to have relied in its reasoning on distinguishing its facts from the situation the Louisiana Supreme Court addressed in *State v. Rice*, 2017-0446 (La. 6/29/17), 222 So.3d 32. 2022-0324, pp. 12-13, 2022 WL 3210100, at *6. In *Rice*, the district court concluded that the State had not sufficiently authenticated video surveillance footage and sustained an objection to the footage lodged by the prosecution. 2017-0446, pp. 1-2, 222 So.3d at 32-33. The Louisiana Supreme Court disagreed, explaining:

> [T]he defense called Shelby Williams, who lives across the street from defendant and whose video surveillance system captured defendant at, according to Mr. Williams's testimony, times pertinent to when the offenses occurred. . . .
>
>    . . . .
>
> The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. La. C.E. art. 901(A). Such evidence may come in the form of testimony by a witness with knowledge that the matter is what it is asserted to be; indications of the item's distinctive characteristics, including its contents, substance, internal patterns, and other distinctive characteristics; or evidence describing the process or system used to produce the item and showing that the process or system produces an accurate result. *See* La.C.E. art. 901(B)(1), (4), and (9).
>
>    Such a showing was made by Mr. Williams's testimony. Contrary to the prosecutor's objection—urging that there was no custodian who could testify about the process by which the video was produced—Mr. Williams explained that he had personally designed and managed the video surveillance system at his home (for security purposes) and knew the video at issue to be what it was asserted to be. He also described the process and system by which the video was created and testified to the accuracy of that system

*Id.* at pp. 1-3, 222 So.3d at 33-34 (footnotes omitted).

After summarizing *Rice*, the Court in *State in Interest of J.H.* distinguished it by observing that "the State offered no testimony from a person who maintained the surveillance video system that recorded the video, to describe the process or

27

system by which the video was created and to attest to the accuracy of the system." 2022-0324, p. 13, 2022 WL 3210100, at *6. However, as the above excerpt from *Rice* demonstrates, the Louisiana Supreme Court addressed the narrow issue of whether the footage *could* be authenticated by Mr. Williams in light of Mr. Williams' testimony that his video surveillance system had captured the defendant at times pertinent to when the offenses occurred, as well as Mr. Williams' testimony that he designed and managed the video surveillance system. 2017-0446, pp. 1-3, 222 So.3d at 33-34. Notably, the Louisiana Supreme Court did not say that this was the only way the footage could have been authenticated or identified or that Mr. Williams was the only witness who could have authenticated or identified the footage. *Id.*

***Assignment of Error Number Two: Whether the Juvenile Court Erred in Permitting Detective McKay to Testify as to the Content of the Video Surveillance Footage***

**"Best Evidence" Rule**

In his second assignment of error, K.B. asserts, in part, that "[i]t was error for the [juvenile court] to allow Detective McKay to testify as to the content of the inadmissible video allegedly depicting the carjacking of Ms. Alphonso [sic]." In this assignment of error, K.B. contends that Detective McKay's testimony was "not the 'best evidence' as to the content of the video," especially "in light of the lack of evidence of the original video's loss or destruction." In his Appellant Brief, K.B. argues that because "the video at issue was available, there was no need for a witness to testify as to its content." In so arguing, K.B. appears to conflate the older, broader version of the "best evidence rule" with the current version of the rule.

As the Louisiana First Circuit Court of Appeal explained in *State v. Francis*:

> The repeal of La. R.S. 15:436 and the adoption of the Code of Evidence resulted "in the demise of any broad 'best evidence' rule of exclusion of evidence." La.C.Ev. Chapter 10, Introductory Note, p. 127 (West 1991). Even under the jurisprudence cited by defendant, defendant's arguments are without merit. Prior to its repeal, La. R.S. 15:436 provided that "[t]he best evidence which from the nature of the case must be supposed to exist, and which is within a party's control, must be produced." Jurisprudence prior to adoption of the Code of Evidence provided that the best evidence of a tape recording was the unaltered tape. An accurate transcription of the tape would be better evidence than oral testimony based on a recollection of a witness to the conversation. *See State v. Sterling*, 444 So.2d 273, 281 (La. App. 1st Cir. 1983).

597 So.2d 55, 59 (La. App. 1st Cir. 1992) (alteration in original). In contrast to the broad best evidence rule found in the now repealed La. R.S. 15:436, "[t]he current Louisiana Code of Evidence provides that '[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by this Code or other legislation.'" *State v. Mattire*, 2011-2390 (La. App. 1 Cir. 9/21/12), 2012 WL 4335432, at *9 (second alteration in original) (quoting La. C.E. art. 1002).

In *State v. Scott*, the defendant asserted that the trial court erred by allowing a deputy to testify concerning the contents of his arrest or police report. 27,104, p. 6 (La. App. 2 Cir. 6/21/95), 658 So.2d 251, 255. Instead, defendant contended that "the best evidence of the 'arrest report' was the report itself." *Id.* On appeal, the Louisiana Second Circuit Court of Appeal found the defendant's reliance on the best evidence rule to be "inappropriate," because "[t]he broad best evidence rule upon which defendant relie[d] no longer exists." *Id.* at p. 7, 658 So.2d at 255. Similar to the defendant in *Scott*, K.B. asserts in his Appellant Brief that because "the video at issue was available, there was no need for a witness to testify as to its content." Like in *Scott*, K.B.'s argument is misguided because it relies on the version of the best evidence rule that no longer exists. That is, the juvenile court

did not err in admitting Detective McKay's testimony about the video surveillance footage on the ground that the footage itself was also available.

Moreover, La. C.E. art. 1002 applies when a party is attempting "[t]o prove the content" of the evidence. As the analysis regarding K.B.'s first assignment of error reveals, Detective McKay's testimony about the video surveillance footage served to lay the foundation for its admissibility under La. C.E. art. 901, not as a summary of its contents. Instead, the State offered the video surveillance footage itself into evidence as proof of the content therein contained.

**Competency of Detective McKay to Testify**

In his second assignment of error, K.B. also asserts that Detective McKay was not a competent witness. He contends that "[i]t does not appear the [sic] Detective McKay developed personal knowledge so as to be a competent witness to testify as to the contents of the video." Also, more broadly, K.B. argues that "[i]n this case there was no evidence introduced that Detective McKay had any personal knowledge of the case."

Louisiana Code of Evidence Article 601 provides for a "[g]eneral rule of competency" by stating that "[e]very person of proper understanding is competent to be a witness except as otherwise provided by legislation." One exception is that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." La. C.E. art. 602. "A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods." *State v. Woodberry*, 2014-0476, p. 22 (La. App. 4 Cir. 6/3/15), 171 So.3d 1082, 1096 (quoting *State v. Deutor*, 2002-1869, pp. 6-7 (La. App. 4 Cir. 3/19/03), 842 So.2d

438, 442). "[G]reat weight is given to the trial judge's determination of competency because of his [or her] opportunity to see and hear the witness. The trial court's decision should not be overturned absent manifest error." *State v. Willars*, 27,394, p. 10 (La. App. 2 Cir. 9/27/95), 661 So.2d 673, 682 (citing *State v. Bean*, 582 So.2d 947, 952 (La. App. 2nd Cir. 1991)).

For example, in *State v. Williams*, the State showed a video from the time of the subject shooting to the jury, and "Detective [Shonndell] Fields [("Detective Fields")] simply described what the video depicted: one person pursuing another from the Scotts' house across the street to the AutoZone parking lot. Detective Fields then identified the two people in the video as [the defendant, Tremaine] Williams and Freddie Scott." 2022-0710, p. 7 (La. App. 4 Cir. 5/15/23), ___ So.3d ___, ___, 2023 WL 3450945, at *4. On appeal, the defendant argued that Detective Fields lacked the requisite personal knowledge to testify regarding the events depicted in the video because she was not an eye-witness to the crime, and the defendant cited La. C.E. art. 602 in support of his argument. *Id.* at p. 8, ___ So.3d at ___, 2023 WL 3450945, at *4. This Court concluded that the district court had not erred in permitting Detective Fields to testify about the video, explaining that her "testimony demonstrated that, through her investigation, she gained adequate personal knowledge of the scene of the shooting, the events of the shooting, and the persons involved to testify to the contents of the . . . video." *Id.*

Likewise, in this matter, the record does not support a finding that the juvenile court committed manifest error in permitting Detective McKay to testify about the video surveillance footage. Like Detective Fields, Detective McKay's testimony demonstrated that, through her investigation, she gained adequate personal knowledge to testify about the video surveillance footage. In particular,

31

Detective McKay testified that she visited the scene of the carjacking; collected the video surveillance footage herself; recounted what she had viewed in the footage; and explained how her investigation eventually led to identifying the perpetrators in the footage as D.J. and K.B. Moreover, though K.B. argues that Detective McKay lacked competency "to testify as to the contents of the video," as discussed previously, Detective McKay's testimony served to authenticate the video surveillance footage, not to prove its contents. In the latter regard, the State entered the video surveillance footage itself into evidence.

In sum, we conclude that the juvenile court did not err in permitting Detective McKay to testify about the video surveillance footage. K.B.'s second assignment of error is without merit.

### Assignment of Error Number Three: Whether the Juvenile Court Erred in Allowing Hearsay Testimony

In his third assignment of error, K.B. contends that the juvenile court "erred in allowing both Detective McKay and Detective Lunn to offer hearsay testimony regarding the identification of K.B. as the perpetrator of both offenses charged in the delinquency petition." According to K.B., "[t]he testimony of both detectives made it clear that the identifications were made by unidentified third parties. The use of hearsay to establish identity was so prejudicial that a new trial is mandated." K.B. argues that this deprived him "of his constitutional rights to confront his accusers and to a fair trial."

**Standard of Review**

As with a district court's ruling on the admissibility of other types of evidence, the abuse of discretion standard of review applies to a district court's ruling on the admissibility of hearsay evidence. *State v. Clanton*, 2019-0316, p. 8

(La. App. 4 Cir. 11/6/19), 285 So.3d 31, 37 (citing *State v. Randolph*, 2016-0892, p. 11 (La. App. 4 Cir. 5/3/17), 219 So.3d 425, 433; *State v. Brown*, 1997-2260, p. 8 (La. App. 4 Cir. 10/6/99), 746 So.2d 643, 648).

**Applicable Hearsay Principles**

Louisiana Code of Evidence Article 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as otherwise provided by this Code or other legislation." La. C.E. art. 802. However, this Court has held that "[a] police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. Such statements are admitted not to prove the truth of the assertion, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the investigating officer." *State v. Keelen*, 1995-0668, p. 6 (La. App. 4 Cir. 2/29/96), 670 So.2d 578, 582 (quoting *State v. Watson*, 449 So.2d 1321, 1328 (La. 1984)). "A police officer's testimony may include information provided by another individual without constituting hearsay only when it is offered to explain the course of the investigation or the officer's actions." *State in Interest of M.B.*, 2019-0931, p. 11 (La. App. 4 Cir. 2/12/20), 292 So.3d 930, 938-39 (citing *Randolph*, 2016-0892, p. 12, 219 So.3d at 434).

For example, in *State v. Mitchell*, the district court upheld the testimony of Detective Ben Bourgeois ("Detective Bourgeois") and described it as providing answers and statements in which he explained that he showed surveillance footage to the victim's mother, who stated that she thought that the footage showed the defendant with her son. 2016-0834, pp. 18-20 (La. App. 1 Cir. 9/21/17), 231 So.3d 710, 725-26. The Louisiana First Circuit Court of Appeal affirmed, concluding that

33

Detective Bourgeois' testimony did not constitute hearsay and summarizing his testimony as follows:

> The questioning by the State was to elicit the steps Detective Bourgeois took to develop the defendant as a possible suspect. The detective explained that he had gotten information that [the victim] was last seen at the bar, and that he had gotten a copy of the bar surveillance video. The detective observed [the victim] and an unknown person leave the bar parking lot around 10:10 p.m. The State then stated, "Okay. And based on that information, what happened next, Detective." Responding in a somewhat extended narrative, Detective Bourgeois explained that he was able to copy some of the surveillance video to his cell phone, and showed this video to the [victim]'s parents. He then stated that [the victim]'s mother saw who appeared to be the defendant on the video, and that she gave him the defendant's cell phone number. The detective then continued to explain, in narrative form, how he pursued his investigation with the defendant's number.
>
> We find, as well, based on the foregoing, that what [the victim's mother] told Detective Bourgeois was not hearsay because it was not offered for the truth of the matter asserted. *See* La. [C.E.] art. 801(C). Detective Bourgeois was merely setting out how, during his investigation, each bit of information led to new information, which led finally to all evidence pointing to the defendant. There is no indication that Detective Bourgeois's statement about what [the victim's mother] told him was made in order to prejudice the defendant, but rather how his investigation unfolded. *See State v. Tribbet*, 415 So.2d 182, 184-85 (La. 1982); *State v. Henson*, 351 So.2d 1169, 1170-71 (La. 1977). Such testimonial evidence of a police officer is admitted not to prove the truth of the out-of-court statements, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the investigating officer. *See State v. Patton*, 2010-1841 (La. App. 1[] Cir. 6/10/11), 68 So.3d 1209, 1220; *State v. Taylor*, 2007-93 (La. App. 5[] Cir. 11/27/07), 973 So.2d 83, 98, *writ denied*, 2007-2454 (La. 5/9/08), 980 So.2d 688.

*Id.* at pp. 19-20, 231 So.3d at 725-26.

**Detective McKay**

Turning to the testimony in the matter *sub judice*, when asked whether she was able to identify the individuals in the video surveillance footage that she had obtained in her investigation into the carjacking of Ms. Alfonso, Detective McKay answered affirmatively. After describing how she and other investigating officers

identified D.J. as one of the individuals in the video surveillance footage via a social media account, Detective McKay then testified about her identification of K.B., and the following colloquy occurred:

> Q    Detective, I placed before you what State is going to mark as Exhibit 4. What have I presented to you?
>
> A    A still image photo from the in car dash[board] cam[era] that we received during our investigation.
>
>     . . . .
>
> Q    How do you know that?
>
> A    We were working together as detectives on these cases and the photo was provided to further my investigation.
>
> Q    And were you able to identify who was in that still image?
>
> A    Yes.
>
> Q    Who was that?
>
> A    [K.B.]

As evidenced by the above colloquy, counsel for the State asked Detective McKay whether she was able to identify who was in the image from the dash camera footage, and she answered affirmatively. That is, contrary to K.B.'s contention, Detective McKay never testified that another unidentified officer or third party identified K.B. for her. Rather, and analogous to the detective's testimony in *Mitchell*, she merely described the sequence of events leading to her identification of K.B. from her viewpoint as the investigating officer.

**Detective Lunn**

Turning to K.B.'s contention regarding Detective Lunn, we note at the outset that counsel for K.B. did not object on hearsay grounds after Detective Lunn testified that he ultimately identified the individual in the still image from Mr.

Willhide's dashboard camera as K.B. Rather, counsel for K.B. objected on *Prieur* grounds to Detective Lunn's reference to "other districts [sic] investigations" but did not lodge a hearsay objection following Detective Lunn's testimony that he identified K.B. The only time counsel for K.B. objected on hearsay grounds during Detective Lunn's testimony is when counsel for the State asked Detective Lunn how he confirmed that the dashboard camera was from Mr. Willhide's car, and Detective Lunn began to respond, "So when we found it - - I believe my sergeant noticed it was a dash[board] camera, so he contacted the officer and asked him if he had - - ." The juvenile court did not have a chance to rule on this objection before counsel for the State instead asked Detective Lunn whether he had an opportunity to review the footage obtained from Mr. Willhide's dashboard camera, and Detective Lunn responded in the affirmative and then described what he had viewed on the footage. On appeal, however, K.B.'s contention that hearsay occurred during Detective Lunn's testimony is centered on the argument that "the *identifications* [of K.B.] were made by unidentified third parties," not about Detective Lunn's confirmation that the dashboard camera came from Mr. Willhide's car. (Emphasis added).

As stated in La. C.Cr.P. art. 841, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." In interpreting La. C.Cr.P. art. 841, this Court has explained that "[a] new basis for objection cannot be raised for the first time on appeal." *State in Interest of C.H.*, 2021-0516, p. 18, 335 So.3d at 462 (quoting *State v. Magrini*, 2019-0951, p. 26 (La. App. 4 Cir. 5/27/20), 301 So.3d 525, 540). Thus, we find that the issue of whether Detective Lunn's identification of K.B. constituted hearsay was not preserved for

36

review. *See State ex rel. L.T.*, 1999-487, p. 8 (La. App. 3 Cir. 10/13/99), 747 So.2d 148, 153 (citing La. C.Cr.P. art. 841).

Regardless, we note that Detective Lunn never testified that another officer or anyone else identified K.B. for him. Rather, Detective Lunn explained that after recovering Mr. Willhide's dashboard camera, he was able to capture an image of one of the two perpetrators from the footage. Thereafter, the following colloquy occurred:

> Q    Okay. So you were able to capture the images -- you were able to capture that image?
>
> A    Yes, it should be saved to a disc and everything.
>
> Q     Okay. Were you able to identify that person?
>
> A    I was later on through some other districts investigations as well.
>
>        . . . .
>
> Q    And were you able to identify the person in that still shot?
>
> A    Yes, I was.
>
> Q    And who was that person?
>
> A    [K.B.]

Like the detective in *Mitchell* and like Detective McKay, Detective Lunn laid out how the course of his investigation led to identifying K.B. Again, contrary to K.B.'s assertion, Detective Lunn did not testify that someone else identified K.B. for him.

Similarly, we find that the juvenile court did not err in failing to sustain the hearsay objection lodged to Detective Lunn's response to how he confirmed that the dashboard camera came from Mr. Willhide's car. Like in *Mitchell*, Detective Lunn's testimony about how he confirmed that the dashboard camera came from

Mr. Willhide's car was an explanation about the course of his investigation. *See also State v. Coleman*, 32,906, p. 27 (La. App. 2 Cir. 4/5/00), 756 So.2d 1218, 1239 (wherein a deputy testified that "[w]e learned that through the course of investigation. The day of the murder he has three other witnesses to count [sic] for his whereabouts, where he was at the approximate time of the murders;" and the Louisiana Second Circuit Court of Appeal concluded that this did not constitute hearsay, explaining that "[t]he State correctly argues that [the deputy] was testifying as to the results of his investigation.")

Accordingly, we conclude that that K.B's third assignment of error lacks merit.

***Assignment of Error Number Four: Whether the Juvenile Court Committed an Error Patent in Failing to Conduct a Disposition Hearing Without a Waiver from K.B. or His Counsel***

In his fourth and final assignment of error, K.B. contends that "[t]he [juvenile court] erred in failing to conduct a disposition hearing and then imposing a non-mandatory maximum disposition without a waiver of the hearing by either K.B. or his counsel." K.B. points out that although counsel for his co-defendant waived the disposition hearing, neither he nor his counsel waived it. For the following reasons, we agree.

Louisiana Children's Code Article 892 provides, in pertinent part, that "[p]rior to entering a judgment of disposition, the court shall conduct a disposition hearing. The disposition hearing may be conducted immediately after the adjudication and shall be conducted within thirty days after the adjudication." The purpose of the hearing is to ascertain whether the juvenile needs treatment or rehabilitation. *State in Interest of W.B.*, 2016-0642, p. 5, 206 So.3d at 978 (citing *State in Interest of T.E.*, 2011-1172, p. 2 (La. App. 4 Cir. 9/19/12), 100 So.3d 963,

964). *See also State in Interest of J.A.J.*, 2013-245, p. 9 (La. App. 5 Cir. 10/30/13), 128 So.3d 449, 454-55 (citing *State in Interest of C.D.*, 1995-160, p. 6 (La. App. 5 Cir. 6/28/95), 658 So.2d 39, 41-42). The juvenile can waive the disposition hearing. *State in Interest of W.B.*, 2016-0642, p. 5, 206 So.3d at 978. However, the waiver must be clear. *See State in Interest of R.J.H.*, 2021-20, p. 37 (La. App. 3 Cir. 5/5/21), 319 So.3d 964, 985; *State in Interest of C.C.H.*, 2021-19, p. 40 (La. App. 3 Cir. 5/5/21), 319 So.3d 940, 963; *State ex rel. T.W.*, 2009-532, p. 9 (La. App. 3 Cir. 10/7/09), 21 So.3d 465, 472 (citing *State ex rel. K.G.*, 34,535, p. 15 (La. App. 2 Cir. 1/24/01), 778 So.2d 716, 726). Additionally, neither silence on the part of the juvenile's counsel nor a failure to object constitutes a waiver. *State in Interest of W.B.*, 2016-0642, p. 5, 206 So.3d at 978-79 (citing *State in the Interest of O.R.*, 1996-890, p. 6 (La. App. 5 Cir. 2/25/97), 690 So.2d 200, 202; *State ex rel. K.G.*, 34,535, p. 15, 778 So.2d at 726; *State in Interest of T.H.*, 2014-179, pp. 12-18 (La. App. 3 Cir. 6/4/14), 140 So.3d 911, 919-23).

Moreover, a juvenile "[j]udge's familiarity with the juvenile does not dispense with the need for a disposition hearing." *State in Interest of O.R.*, 1996-890, p. 6, 690 So.2d at 202. The Louisiana Fifth Circuit Court of Appeal has held that even if a juvenile court judge is "well acquainted with [the juvenile] and his 'long and lengthy history with the court,'" the juvenile court must hold a disposition hearing prior to entering a judgment of disposition. *Id.* at p. 5, 690 So.2d at 202 (citing La. Ch. C. art. 892). Likewise, the Louisiana Third Circuit Court of Appeal has held "that familiarity with a juvenile and a lengthy history with the [juvenile] court does not absolve the [juvenile] court from conducting a disposition hearing." *State ex rel. T.W.*, 2009-532, pp. 9-10, 21 So.3d at 472. If a juvenile court fails to conduct a disposition hearing, this constitutes an error patent,

and the appellate court should remand the matter for the juvenile court to conduct a disposition hearing. *State in Interest of W.B.*, 2016-0642, pp. 5-6, 206 So.3d at 978-79.

Our review of the transcript of the March 20, 2023 hearing reveals that K.B. is correct that neither he nor his counsel waived La. Ch. C. art. 892's requirement of a disposition hearing. Instead, when the juvenile court asked about "waiving delays," only counsel for D.J. responded in the affirmative. K.B. and his counsel did not say anything in response. Additionally, although the juvenile court noted its familiarity with K.B., jurisprudence has held that this does not absolve the court of conducting the hearing. Thus, we conclude that the juvenile court erred in failing to conduct a hearing prior to entering a judgment of disposition regarding K.B. and that this constituted an error patent. Accordingly, we remand this matter for the juvenile court to conduct a disposition hearing.

## DECREE

For the foregoing reasons, we affirm K.B.'s adjudication of delinquency; vacate his disposition; and remand for further proceedings consistent with this Opinion.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS**